Mechel DOTLICH, Monnie Dotlich, Defendants-Appellants,

v.

Sam DOTLICH, as a shareholder of Dotlich Bros. Corp. and on behalf of such corporation, Plaintiff-Appellee,

Merko Dotlich, Dotlich Bros. Corp., Defendants-Appellees.

No. 1-1183A357.

Court of Appeals of Indiana, First District.

March 13, 1985.

Rehearing Denied April 23, 1985.

Donald A. Schabel, Indianapolis, Melvin N. Fredbeck, LaGrange, Fredbeck & Deppe, Franklin, for Mechel Dotlich.

Wayne C. Ponader, Alan W. Becker, Bose, McKinney & Evans, Indianapolis, for Monnie Dotlich.

Marvin Mitchell, Richard J. Dick, Ann E. Bartlett, Mitchell Hurst Pinkus Jacobs & Dick, Indianapolis, Tom Jones, Jones, Loveall, Johnson & Boyll, Franklin, for Sam Dotlich.

RATLIFF, Presiding Judge.

## STATEMENT OF THE CASE

This is a shareholder's derivative action brought on behalf of Dotlich Brothers Corporation by Sam Dotlich a director and shareholder. Mechel Dotlich and Monnie Dotlich appeal from special findings of fact and a judgment against them for fraud and breach of their respective fiduciary duties as directors of the corporation. A con-

structive trust was imposed on property held by Monnie Dotlich ordering him to convey it to the corporation. Monnie was assessed $9,288 in compensatory damages and $20,000 in punitive damages. Mechel, Merko, and Sam Dotlich were ordered to reimburse the corporation for their homes according to their respective values as of 1978. Mechel and Monnie were also assessed $351,252.25 in attorney fees and costs. Finally, a receiver was appointed to take over the business of the corporation. We reverse the attorney fee award and punitive damage award against Mechel. In all other respects we affirm.

## FACTS

In 1948, four brothers, Monnie, Mechel, Merko, and Sam Dotlich, formed a partnership to run a heavy equipment rental business. As the business grew, the four partners decided to acquire real estate upon which buildings could be erected to give the business extra space. In 1951, a 56 acre tract of land in Speedway was purchased with partnership funds. Sam, Merko, and Mechel agreed that the property should be titled in Monnie's name. The brothers subsequently cleared the land and developed it by erecting buildings which were leased by the partnership to other businesses.

In 1957, three lots on Kessler Boulevard were purchased. Sam, Mechel, and Merko each received a lot, deeded in his own name. Sam told Monnie he was entitled to a lot of his own but Monnie declined. In 1963, and 1964, homes were built on each lot for the three brothers and their families. By this time, two corporations had been formed. Dotlich, Inc., formed in 1960, ran the heavy equipment rental business. In 1962, Dotlich Brothers, Inc. (the corporation) was formed to carry on a real estate investment business. The corporation was the successor in interest to the real estate acquired by the partnership. Monnie, Mechel, Merko, and Sam each held a 25% share of the corporation's stock.

Before going further, it is necessary to discuss the handling of partnership and corporate finances. Basically, every financial transaction involved a single account. From 1948 on, all expenses and purchases were paid out of a single checking account controlled by Monnie. No distinction was drawn between business and personal expenses. Apparently, whenever money was needed by any of the brothers, Monnie would simply draw a check on the corporate account. Similarly, all income obtained was deposited into this account. Again, no distinction was drawn between personal and business income. For example, rental receipts from the buildings on the Speedway property as well as Sam's government disability check were deposited into the corporate account which the brothers called the common pot. The purchase money and development capital for the Speedway property and the three residences came from the common pot.

In 1964, a farm in Clermont was purchased with corporate funds apparently for investment purposes. The deed to this property was put in Monnie's name as was the Speedway deed. However, unlike the Speedway title, Sam was not aware Monnie was the record owner of the Clermont Farm.

In 1973, a 188 acre tract, referred to as the Mansfield Lake property, was purchased with corporate funds. Sam, when questioned by Monnie, agreed the purchase would be a good investment. However, the property was again titled in Monnie's name without Sam's or Merko's knowledge. The corporation spent additional amounts to develop the land by clearing it and installing drainage pipes and a septic system.

From 1974 to 1975, three rental properties were purchased with corporation funds. Again, unknown to Sam and Merko, these homes were all titled in Monnie's name. Rental income from these homes was put into the common pot.

All of the land titled in Monnie's name, *i.e.,* the Speedway property, the Clermont Farm, the Mansfield Lake property, and the rental properties, was purchased, developed, maintained, and insured with corporate funds. Taxes were also paid with

corporate funds and each parcel was listed on corporate tax returns as a corporate asset. The three Kessler Boulevard homes, titled in Sam's, Merko's and Mechel's names, were also considered corporate assets. Taxes, maintenance, insurance and construction were paid for by the corporation. Simplified tremendously, the present controversy involves ownership of these nine pieces of property. Monnie claimed, at trial, that he was the ultimate owner of the six properties titled in his name. Mechel agreed with Monnie and also claimed he was the absolute owner of his Kessler Boulevard residence. Sam and Merko, on the other hand, contended the beneficial owner of all nine parcels was the corporation.

In 1976, Sam discovered the Clermont Farm, Mansfield Lake property, and three rental properties were titled in Monnie's name. He obtained private counsel who wrote a letter to his three brothers notifying them that Monnie was the owner of record of these five parcels. Sam requested the directors take action to remedy this irregularity, but none was taken. Later, a board of directors meeting was held on the subject of allowing Sam to take his share and withdraw from the corporation. A plan was worked out between Sam's accountant and the accountant for the corporation, but it was rejected by the brothers. Monnie was opposed to Sam's withdrawal and indicated to Merko that he (Monnie) would "grab all the money" so Sam could not withdraw.

In 1978, Sam attempted to supervise Monnie's control of corporate funds by getting independent financial statements. Sam also believed it was crucial that the six properties titled in Monnie's name be conveyed to the corporation. Regarding the Speedway property, Sam, as well as Mechel and Merko, always were aware that Monnie's name appeared on the deed. However, Sam always had thought, at least prior to 1976, that Monnie recognized beneficial title to the property was in the corporation. When he discovered the other five tracts were also titled in Monnie's name, Sam took the same position that Monnie was merely holding title as trustee and the corporation was the beneficial owner. Sam understood that all the property had been purchased and maintained with corporate funds.

In the 1960's, an IRS agent investigating the corporate tax returns, questioned deductions taken on the Speedway property since the owner of record was Monnie. The corporation's accountant stated that Monnie held the land as trustee for the corporation. Similarly, Sam confronted the issue of the ultimate ownership of the three residences built for himself, Merko, and Mechel by admitting this property also belonged to the corporation. Merko agreed with Sam stating it was his understanding the homes on Kessler Boulevard belonged to the corporation.

In an attempt to settle the disagreement, the brothers held one final meeting of the corporate directors. Sam introduced a resolution which would have empowered Sam, Merko, and Mechel to supervise the necessary conveyances to insure that all corporate property would be titled in the corporate name. Sam and Merko voted to pass the resolution but Monnie and Mechel voted against it deadlocking the directors on the issue.

Convinced that further negotiation would be fruitless, Sam initiated a shareholder's derivative action on behalf of the corporation naming Monnie and Mechel as defendants. Merko was brought in as a necessary party. The complaint alleged Monnie and Mechel had breached their fiduciary duties to the corporation by converting corporate opportunity to their own benefit. Monnie was accused of mismanagement of corporate finances and improperly holding valuable corporate property in his own name. Mechel was accused of aiding and abetting Monnie's acts. The corporation asked that the property be conveyed to the rightful owner and punitive damages be assessed against Monnie and Mechel. The complaint also requested a court appointed receiver to take over the business of the corporation. Monnie responded by filing a

counterclaim for an accounting which, pursuant to the pre-trial order, was separated from the derivative action and is still pending.

The trial court entered special findings under Indiana Rules of Procedure, Trial Rule 52(A) in favor of the corporation on all issues raised. The property claimed by Monnie was to be transferred to the corporation by imposition of a constructive trust. All three Kessler Boulevard homes were found to be corporate property and Sam, Merko, and Mechel were ordered to pay the corporation the value of their respective residences. Punitive damages, attorney fees, and expenses were assessed against Monnie and Mechel in favor of the corporation. Mechel and Monnie now appeal.

## ISSUES

Both Monnie and Mechel raise substantial issues for review. Restated and reordered they are as follows:

1. Did the trial court err by allowing this action to proceed as a shareholder derivative suit?

(A) Was Sam a proper representative to pursue the derivative claim?

(B) Were the technical requirements of T.R. 23.1 met?

(C) Does the statute of frauds prohibit transfer of the Speedway property to the corporation?

2. Do the applicable statutes of limitation bar the instant action?

3. Did the court err by finding Monnie breached his fiduciary duty to the corporation?

4. Did Mechel breach his fiduciary duty to the corporation?

5. Did the trial court err by appointing a receiver to take over the corporation's business?

6. Did the court err by awarding punitive damages against Monnie and Mechel?

(A) Was the evidence sufficient to support an award of punitive damages under the clear and convincing standard?

(B) Is an award of compensatory damages a prerequisite to an award of punitive damages in this case?

7. Did the trial court err by assessing attorney fees and expenses against Monnie and Mechel?

8. Was the issue of ownership of Mechel's residence tried by implied consent?

*Issue One*

The first series of issues focuses on the requirements which must be satisfied before a shareholder's derivative action can be maintained. Indiana Rules of Procedure, Trial Rule 23.1 states:

"In a derivative action brought by one or more shareholders or members or holders of an interest in such shares of membership, legal or equitable, to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege that the plaintiff was a shareholder or member or holder of an interest, legal or equitable, in such shares or membership at the time of the transaction or any part thereof of which he complains or that his share or membership thereafter devolved on him by operation of law, and the complaint shall also allege with particularity the efforts, if any, made by the plaintiff, to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs."

Both Monnie and Mechel argue the trial court erred by finding Sam was an

adequate representative of the corporation to maintain the derivative action on its behalf. Specifically, it is argued Sam participated in the same improper activity since a lot was purchased and a house constructed for him with corporate funds. In *Gabhart v. Gabhart* (1977), 267 Ind. 370, 370 N.E.2d 345, the supreme court noted that a situation may arise where all shareholders have participated in the wrong complained of and no shareholder would then be able to bring a derivative suit. In such a case, the corporation would not be entitled to bring an action either. *Ross v. Tavel* (1981), Ind. App., 418 N.E.2d 297, *trans. denied; see also* 13 W.M. Fletcher, *Cyclopedia of the Law of Private Corporations* § 5972 (Callahan 1984).

However, Sam did not participate in the wrong committed by Monnie and Mechel against the corporation. It is true Sam had property titled in his name which was purchased with corporate funds. This caused no harm to the corporation so long as Sam recognized the corporation was the ultimate owner. In fact, Sam conveyed the property back to the corporation. Record at 1956, 2069, 2283. On the other hand, Monnie and Mechel claimed absolute ownership of all property titled in their names. Mechel claims in his brief that he owns the Kessler Boulevard residence built for him. Monnie claims the Speedway property, Clermont Farm, Mansfield Lake development, and three rental properties belong to him exclusively. The main purpose of this action was to order Monnie to convey the six parcels back to the corporation which he refused to do on his own. Therefore, it cannot be said Sam participated in the wrong complained of in this action.

■ Mechel also argues that by suing derivatively Sam occupies the position of both plaintiff and defendant. The flaw in this argument becomes apparent when the nature of a derivative suit is examined. Whether or not the suit may be maintained depends on whether the corporation has rights to be enforced. W.M. Fletcher, *supra* § 5947. The action does not involve a personal right, but rather the rights of the corporation. *Id.* All relief obtained in the action belongs to the corporation. *Id.* § 5953. Indeed, the shareholder's motive for instituting the derivative action is normally irrelevant.[1] *Id.* § 5972.

■ Mechel continues his argument contending that a director should not be able to sue derivatively on behalf of his corporation. Such a holding would be inconsistent with the law in other jurisdictions. In *Tenney v. Rosenthal* (1959), 6 N.Y.2d 204, 189 N.Y.S.2d 158, 160 N.E.2d 463, the New York Court of Appeals commented on the rationale underlying a statute which permits a director to sue derivatively:

> "The situation is, obviously, quite different in the case of the director's derivative suit. His right to sue is based on the public policy declared by the Legislature upon enactment of the statute. We may assume that the right to bring suit has been granted in order to facilitate and improve the director's performance of the 'stewardship obligation' which he owes to the corporation and its stockholders to protect him from possible liability for failure to proceed against those responsible for improper management of the corporation affairs."

*Tenney*, 189 N.Y.S.2d at 163, 160 N.E.2d at 467. *Cf. Holt v. College of Osteopathic Physicians* (1964), 61 Cal.2d 750, 40 Cal. Rptr. 244, 394 P.2d 932 (minority trustees could bring suit against majority trustees on behalf of charitable corporation); *but cf. Traylor v. Marine Corp.* (E.D.Wis.1971), 328 F.Supp. 382 (fact that class representative in class action was a director in corporation and thus, possibly an indispensable party defendant, might have been grounds for dismissal). Unlike New York, Indiana has no statute expressly authorizing directors to maintain derivative suits on behalf of their corporation. However, we feel the policy described in *Tenney* is appli-

---

1. An exception occurs where a shareholder pursues a derivative action to enhance his position in another action where he is suing to enforce a personal right. *See, e.g., Robinson v. Computer Servicecenters, Inc.* (N.D.Ala.1976), 75 F.R.D. 637.

cable to the case at bar. We see no reason why Sam should be barred from suing on behalf of the corporation just because he is a director. W.M. Fletcher, *supra* § 5972.1.

Besides the requirement that Sam be an adequate representative, T.R. 23.1 also requires that a complaint in a derivative action specifically allege the particular efforts made to obtain the relief requested. Monnie and Mechel argue this requirement was not satisfied. They contend a demand must be made by the shareholders which indicate their grievances to the board of directors in the form of a resolution.[2] This is exactly what happened in the present case. Sam introduced a resolution which, if passed, would have insured that all property believed to belong to the corporation would be titled in the corporate name. This resolution was not passed because Monnie and Mechel voted against it. Obviously, the board of directors had an opportunity to remedy Sam's complaints and avoid the derivative suit. By its failure to pass the resolution the board rejected non-judicial efforts to obtain the relief requested in the derivative complaint.

Monnie next argues the corporation was not the proper party to pursue the Speedway property. Rather, the real party in interest to maintain the action was the partnership. The Speedway property was acquired in 1951 before the formation of the corporation and the funds used belonged to the partnership. Monnie contends the corporation could obtain an interest in the Speedway property only through a written document purporting to transfer it from the partnership to the corporation because the conveyance would be within the statute of frauds. This argument does not fit the case at bar.

The transfer of the Speedway property was not within the statute of frauds. The court imposed a constructive trust on the Speedway land with Monnie as constructive trustee. Monnie was ordered to convey the property to the partnership's successor in interest, the corporation. The authority of the court to impose the equitable remedy of a constructive trust is not restricted by the statute of frauds. *Criss v. Bitzegaio* (1981), Ind., 420 N.E.2d 1221, 1224; *Melloh v. Gladis* (1974), 261 Ind. 647, 309 N.E.2d 433; *cf. Hutter v. Weiss* (1961), 132 Ind. App. 244, 177 N.E.2d 339 (title passing by equitable estoppel is outside statute of frauds); *compare Colbo v. Buyer* (1956), 235 Ind. 518, 134 N.E.2d 45 (where resulting trust occurs by operation of law due to termination of trust agreement, a writing is required to extinguish the beneficiaries' interest if trust corpus is land).

*Issue Two*

Monnie next argues that the statute of limitations barred the corporation from litigating the ownership of the Speedway property and Clermont Farm. The property in Speedway was purchased in 1951 and the Clermont Farm in 1964. Conceding that if the cause of action accrued in 1964, when the corporation was formed, because the present suit was brought in 1979 it is barred by both the fifteen year statute[3] and six year statute[4] according to Monnie.

We believe this derivative action was timely brought despite the lapse of time because the action was concealed by Monnie. Indiana Code section 34–1–2–9 (1982) states: "If any person liable to an action shall conceal the fact from the knowledge of the person entitled thereto, the action may be commenced at any time within the period of limitation, after the discovery of the cause of action." Monnie's claim of exclusive ownership of the Speedway property and Clermont Farm was concealed until 1976. Therefore, the derivative action was timely brought.

Monnie argues Sam had been aware of Monnie's exclusive claim of ownership for fifteen years. The trial court obviously disagreed as finding number 44 stated Sam

---

2. Under certain circumstances a demand is unnecessary. *Tevis v. Hammersmith* (1903), 31 Ind.App. 281, 66 N.E. 912, *aff'd* 161 Ind. 74, 67 N.E. 672.

3. Indiana Code section 34–1–2–3 (1982).

4. Indiana Code section 34–1–2–1 (1982).

did not discover Monnie's claim until 1976. When reviewing a trial court's findings of fact we will not set aside a finding unless it is clearly erroneous and we are required to give due regard to the trial court's judgment of the credibility of witnesses. Indiana Rules of Procedure, Trial Rule 52(A). A finding is clearly erroneous only where the evidence is uncontradicted and will not support a reasonable inference in favor of the finding. *Merchants National Bank & Trust v. H.L.C. Enterprises* (1982), Ind. App., 441 N.E.2d 509, 511–12. Sam testified he was unaware of Monnie's claim of ownership of the six parcels until four or five years prior to trial. This supports the court's finding. Monnie stresses another portion of Sam's testimony and argues it supports his contention.

"Q. During the uh,—have you ever had occasion to discuss the question of the title to the Speedway land with your brother, Mike?

A. Yes, I did.

Q. How long ago was that?

A. Oh, about the first time was,—about fifteen (15) years ago. Uh, I told my brother, Mike, 'cause if I could persuade him,—I know I could uh had the battle whipped. And I told my brother, Mike,—I says, 'We're all getting older and been married and uh we're gonna have a death in the family before we have a divorce and I think we should try to get this property back in the right names.' And he always would assure me. He said, 'Monnie has a will.' And I said, 'Well, Mechel, I have never seen this will.' He said, 'Well, he's got one.' And uh that's about it.

Q. That's the best you could get out of him?

A. That's correct."

Record at 1712–13. Even if we agree that this testimony supports Monnie's position it would only establish that the evidence was in conflict and we would still have to accept the trial court's finding.[5]

Monnie also makes the legal argument that Sam's lack of knowledge of Monnie's claim does not constitute active concealment. Under most circumstances the concealment statute will extend a party's time to file a suit only when the opposing party actively and intentionally conceals the cause of action. *Forth v. Forth* (1980), Ind.App., 409 N.E.2d 641. In *Forth* the court characterized concealment as some "trick" or "contrivance" on the part of the defrauder. However, where the defrauder has a duty to disclose material information to individuals with whom he has a fiduciary or confidential relationship the requirements of active and intentional conduct do not apply. *Forth*, 409 N.E.2d at 645; *Guy v. Schuldt* (1956), 236 Ind. 101, 138 N.E.2d 891. Clearly, Monnie had a fiduciary duty to both the corporation and the other shareholder-directors. *Hartung v. Architects Hartung/Odle/Burke, Inc.* (1973), 157 Ind.App. 546, 301 N.E.2d 240, 243, *trans. denied;* 19 Am.Jur.2d *Corporations* § 1272 (1965). Monnie had a duty to act fairly, honestly, and openly with his brothers and the corporation. *Hartung.* Indeed, because of Monnie's total control over the corporation's funds and the absolute trust and faith bestowed on him by his brothers, Monnie may have been bound by an even higher standard of duty. *Id.* Monnie's fiduciary responsibility required him to disclose to the other directors that he intended to keep the Speedway property.

Monnie discussed the purchase of the Speedway property with all three of his brothers. The testimony at trial revealed the purchase was made because the Dotlich Brothers heavy equipment rental business needed more space. In the late 1950's buildings were constructed on this property. Monnie concedes these buildings are owned by the corporation. Under the circumstances, Sam and Merko were justified

**5.** This testimony is not necessarily inconsistent with the trial court's finding. While it reveals Sam knew the Speedway property was in Monnie's name it does not necessarily establish Sam was aware that Monnie claimed it as his own.

in believing the Speedway property was owned by the corporation until notified otherwise by Monnie. Therefore, the cause of action regarding the Speedway property did not acrue until Sam and Merko were made aware of Monnie's exclusive claim due to Monnie's fiduciary duty to disclose.

Monnie's failure to disclose his ownership of the Clermont Farm also tolled the statute of limitations. The Clermont Farm acquisition represented a valuable investment opportunity for the corporation and for Monnie to claim it as his own required him to first make disclosure and obtain consent from his brothers. 19 Am. Jur.2d *Corporations* § 1281 (1981). "The duty to disclose stems from the necessity of preventing a corporate insider from utilizing his position to take unfair advantage of the uninformed minority stockholders." *Johnson v. Central Standard Life Insurance Co.* (1968), 102 Ill.App.2d 15, 243 N.E.2d 376, 384; *Speed v. Transamerica Corp.* (D.Del.1951), 99 F.Supp. 808, 829 *aff'd* (3d Cir.1956) 235 F.2d 369. Monnie's failure to disclose his claims of ownership tolled the statute of limitations until 1976 and, therefore, the present action was timely brought pursuant to Ind.Code § 34–1–2–9.[6]

### Issue Three

Monnie next argues that there was insufficient evidence to support the trial court's determination that he violated his fiduciary duty. Initially, we note Monnie had the burden of proof on this issue at trial. Once it is established that one with a fiduciary duty has attempted to benefit from a questioned transaction, the law presumes fraud. *Lucas v. Frazee* (1984), Ind. App., 471 N.E.2d 1163. At this point, the burden of proof shifts to the party with the fiduciary duty to overcome the presumption by showing his actions were honest and in good faith. *Id.; Blaising v. Mills*

(1978), 176 Ind.App. 141, 374 N.E.2d 1166; *Schemmel v. Hill* (1930), 91 Ind.App. 373, 383, 169 N.E. 678, *trans. denied; Zaring v. Kelly* (1920), 74 Ind.App. 581, 583, 128 N.E. 657, 658; W.M. Fletcher, *supra* § 974. We have already established Monnie had a fiduciary duty to his co-directors and the corporation. Moreover, it is clear he sought to benefit by retaining title to the property acquired during the questioned transactions.

Because the trial court found against Monnie on an issue on which he had the burden of proof, he is appealing from a negative judgment and cannot question the sufficiency of the evidence on appeal. *Rogers v. Rogers* (1982), Ind.App., 437 N.E.2d 92; *State Highway Commission v. Ziliak* (1981), Ind.App., 428 N.E.2d 275; *Captain & Co. v. Towne* (1980), Ind. App., 404 N.E.2d 1159. Rather, he may only challenge whether the trial court's decision is contrary to law. *Captain & Co.* This means we may reverse only where the evidence is uncontradicted and leads unerringly to a conclusion different from that reached by the trial court. *Id.* No one disputes the fact that Monnie purchased and maintained the six parcels at issue with funds from the corporate account. Monnie argues that in actuality the money spent represented his salary. In fact, Monnie is asking us to reweigh the evidence on appeal which is something this court will not do. *Id.* The trial judge's determination that Monnie violated his fiduciary duty is not contrary to law and we, therefore, find no error.

### Issue Four

Mechel raises a number of arguments challenging the trial court's determination that he violated his fiduciary duty to the corporation. We begin our analysis by stating the applicable law.

---

6. Mechel also argues that Sam could have discovered Monnie's wrongful acts through a diligent inspection of corporate records. Due to the fiduciary relationship between Sam and Monnie, Sam did not have to exercise diligence to guard against his co-director's misappropriation of assets. Sam was justified in trusting Monnie and his failure to inspect corporate records and discover irregularities did not affect the tolling of the statute of limitations under Ind.Code § 34–1–2–9. *Reid v. Robinson* (1923), 64 Cal.App. 46, 220 P. 676.

■ Mechel was a director of the corporation and, as such, owed a fiduciary duty to the corporation the same as Monnie. Ordinarily, a director is not liable for the misconduct of a co-director. However, an exception occurs where he actually participates in the wrongdoing. *McDonough v. Jones* (1980), 48 Or.App. 785, 617 P.2d 948; *Rosenbloom v. Electric Motor Repair Co.* (1976), 31 Md.App. 711, 358 A.2d 617. Also, a director is liable if he learns of a co-director's misdeeds and either takes no action or acquiesces therein. *In re Illinois Acceptance Corp.* (C.D.Ill.1982), 531 F.Supp. 737; *Reid v. Robinson* (1923), 64 Cal.App. 46, 220 P. 676. The director is under a duty to disclose the misconduct of a co-director to the other directors in order to avoid liability for acquiescence. *Id.* To avoid liability "it is incumbent upon a corporate director, on learning facts sufficient to put a prudent man on guard, to take the appropriate action under the circumstances." *Graham v. Allis-Chalmers Manufacturing Co.* (1963), 41 Del.Ch. 78, 188 A.2d 125; *see generally Briggs v. Spaulding* (1891), 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662 (care owed by directors is that which reasonably prudent director of a like corporation would have exercised under the circumstances).

■ Under the circumstances of the present case, Mechel had a duty to inform Sam and Merko that Monnie claimed exclusive ownership of corporate property. The pertinent findings of fact and conclusions of law are as follows:

"64. Mike violated his fiduciary obligations in favor of the Corporation when he:

had knowledge that Monnie was claiming that he, Monnie, was the beneficial owner of the Speedway Land and that the purchase price was paid from the Monnie Dotlich account, and that commercial buildings were being built on the Speedway Land by the partnership and thereafter by the Corporation, and Mike took no action to protect the partnership or the successor Corporation.

had knowledge that monies for the purchase of Clermont Farm, the Mansfield Lake property and the three houses came from the Dotlich Bros. account and that Monnie was claiming that he, Monnie, was the beneficial owner thereof, and Mike took no action to protect the Corporation....

65. Mike conspired, aided, and assisted Monnie in his attempts to deprive the Corporation of its rightful properties."

Record at 1100–01. As stated earlier, we will set aside a trial court's findings only if they are clearly erroneous. Trial Rule 52(A). We will neither weigh evidence nor judge the credibility of witnesses. *American Independent Management Systems, Inc. v. McDaniel* (1982), Ind.App., 443 N.E.2d 98. We consider only the evidence which supports the judgment and reasonable inferences drawn therefrom. *Id.* Mechel acquired knowledge of Monnie's exclusive claim of ownership but failed to disclose this fact to Merko and Sam. Mechel testified that he knew Monnie claimed beneficial ownership of the Speedway property from the date it was purchased. Record at 2307.

Mechel argues Sam knew as much about the Speedway property as he did. However, there was evidence that Sam did not know Monnie claimed absolute ownership of any of the six parcels until 1976. Because we will not weigh the evidence, we conclude Sam was not aware of Monnie's misconduct to the same extent as Mechel. Due to his failure to act according to his fiduciary duty Mechel is liable to the corporation.

■ There is also a second basis for the trial court's finding that Mechel violated his fiduciary responsibilities. Even if Mechel was unaware of Monnie's misconduct, he obtained this information through the letter sent by Sam to all the directors. The letter stated that corporate property was not properly titled in the corporate name. When asked to cooperate by voting in favor of a resolution to cure these irregularities he refused. Instead, Mechel voted against the resolution, thereby deadlocking the di-

rectors and preventing the corporation from assuming full ownership of corporate assets. Mechel's conduct raises an inference that he was involved in Monnie's attempt to misappropriate corporate assets. Because we look to the evidence most favorable to the court's findings and reasonable inferences therefrom, we agree with the trial court's determination that Mechel aided and abetted Monnie and participated in his wrongful conduct.

■ Mechel also states the corporation was not in any way harmed by his actions. In response, we point out that the corporation had to resort to legal process to remedy the irregularities. This required a great expenditure of time and corporate resources. Clearly, the corporation suffered harm.

*Issue Five*

■ Monnie and Mechel both argue that the trial court should not have appointed a receiver. In Indiana there are two sources of statutory authority for the appointment of a receiver. Title 23 provides a receiver may be appointed to take charge of a corporation during involuntary dissolution. Indiana Code section 23–1–7–3(b) (1982). This statute does not apply to the present case since this was not an action to dissolve the corporation. *Crippin Printing Corp. v. Abel* (1982), Ind.App., 441 N.E.2d 1002, 1006. On the contrary, the present suit was instituted as a shareholder derivative action to force directors to recognize corporate ownership of corporate assets. No findings indicate insolvency or imminent irreparable injury. *Id.*

■ Indiana Civil Procedure also provides for the appointment of a receiver. A trial court may appoint a receiver when funds are in danger of being lost or when, in the discretion of the court, justice and equity require the appointment. Indiana Code section 34–1–12–1(3) and (7) (1982). Generally, the appointment of a receiver is a drastic remedy which should be exercised with great care and only where no other adequate remedy at law or equity exists. *Lafayette Realty Corp. v. Moller* (1966),

247 Ind. 433, 215 N.E.2d 859; *Ziffrin Truck Lines, Inc. v. Ziffrin* (1962), 242 Ind. 544, 180 N.E.2d 370; *Tri-City Electric Service Co. v. Jarvis* (1933), 206 Ind. 5, 185 N.E. 136. In the present case there were no findings showing the corporation was insolvent. Therefore, a truly strong showing is required to justify the appointment of a receiver. *Tri-City.* In *Tri-City*, however, the supreme court upheld the receivership remedy under facts analogous to those in the present case. *Tri-City* was a derivative action by a minority stockholder against a majority shareholder who controlled all corporation business transactions. The majority stockholder had breached his fiduciary duty of good faith and honesty and the court determined that receivership was the proper remedy.

"It will be a rare case in which such a drastic remedy can be equitably applied, but it would seem to be the only practicable remedy in the instant case in which all the stock is held by the complaining minority stockholder and one majority stockholder, with the exception of one share, the holder of which is completely controlled by the majority stockholder; and when the offending majority stockholder is the only person connected with the corporation who is capable of managing the business affairs of the corporation."

*Tri-City* at 21, 185 N.E. at 141.

Similarly, in the present case, there seems to be no remedy other than receivership which would adequately protect the corporation's business and assets. Monnie, as the managing director, treated corporate assets and funds as his own. Even while this litigation was pending, Monnie secretly withdrew funds from the corporate account to pay his own attorney fees. These acts together with his breaches of fiduciary duty make it obvious Monnie should not be allowed to control corporate funds. Likewise, Mechel's conduct and the fact he supported Monnie's wrongful acts disqualifies him from being given the responsibility of managing the day-to-day operations of the business. Neither Sam nor Merko oppose

the appointment of a receiver; indeed Sam's derivative complaint requested the relief. Furthermore, it is safe to assume that the directors would not have been able to agree on an outsider to manage the business. Therefore, we believe the trial judge acted within his discretion in appointing a receiver despite the extraordinary nature of the remedy.

*Issue Six*

 The next series of questions raised by the appellants involve the award of punitive damages in the amount of $20,000 against Monnie and $10,000 against Mechel.

Monnie challenges whether the trial court applied the proper standard of proof. In *Traveler's Indemnity Company v. Armstrong* (1982), Ind., 442 N.E.2d 349, the supreme court held punitive damages may be awarded only where the requisite elements are established by clear and convincing evidence. All parties agree this standard applies to the present case. Monnie states that it is unclear from the record whether the trial judge's award was based on a preponderance standard or clear and convincing standard. Our review of the record compels us to agree. However, Monnie cannot continue his argument by summarily concluding the judge must have applied the wrong standard. On the contrary, the law in Indiana requires appellate courts to presume the trial judge correctly applied the law. *In re VMS* (1983), Ind. App., 446 N.E.2d 632, 633. No presumption exists in favor of Monnie, since he has the burden of showing error on appeal. *Barnd v. Borst* (1982), Ind.App., 431 N.E.2d 161, *trans. denied. Travelers* was decided well before the present suit was concluded.[7] Because nothing indicated which standard of proof was applied, the presumption in favor of the trial judge operates and we find no error.

 Monnie next argues that the evidence adduced at trial was insufficient to support an award of punitive damages.

Finding 69 essentially provides the basis for the award.

"69. That the acts of Monnie and Mike with respect to the six (6) parcels of real estate were intentional, wrongful, fraudulent, oppressive, in bad faith, and with heedless disregard to the rights of the Corporation, and by reason thereof punitive damages should be assessed against each of them ..."

Record at 96. Despite the increased burden on the party seeking punitive damages established in *Travelers*, our standard of review of such an award is essentially unchanged.

"In reviewing [an] award of punitive damages, we will neither weigh the evidence nor determine the credibility of witnesses. Our inquiry is limited to determining whether the verdict is sustained by substantial evidence of probative value. *Riverside Insurance Co. v. Pedigo*, (1982) Ind.App., 430 N.E.2d 796, 803. We consider the evidence and reasonable inferences arising therefrom in the light most favorable to appellees and will reverse only if the evidence leads to but one conclusion and an opposite conclusion was reached below. *Woodward Insurance, Inc. v. White*, (1982) Ind., 437 N.E.2d 59, 67; *Riverside Insurance, Inc., supra*, 430 N.E.2d at 804. To be substantial and of probative value as to a punitive damages award, the evidence must be clear and convincing, that is, there must be some evidence (a) of malice, fraud, gross negligence or oppressive conduct mingled in the breach in tortious breach of contract cases or of malicious, reckless, or wilful and wanton misconduct in pure tort cases, and (b) the tortious conduct is inconsistent with a hypothesis of mere negligence, mistake of law or fact, over-zealousness, or other noniniquitous human failing."

*Orkin Exterminating Co., Inc. v. Traina* (1984), Ind.App., 461 N.E.2d 693, 698 (transfer pending). Clearly, there was some evidence that Monnie's acts were more than

---

7. *Travelers* was decided December 9, 1982. The trial in the present case ended by February 10, 1983 and findings were entered on April 20, 1983.

negligent and were willful, malicious and oppressive. Monnie threatened to "grab all the money" to prevent Sam from leaving the corporation. Record at 2551. Monnie had five of the parcels titled in his own name without authorization from the board. He used corporate funds as his own. Despite his use of corporate funds to acquire and develop substantial investment properties Monnie claimed exclusive ownership of the real estate. This evidence is sufficient to sustain the punitive damages award.

Monnie and Mechel[8] both argue that the punitive damage award against them was contrary to law because no judgment for compensatory damages was entered. Although the necessary elements for an award of punitive damages were found in finding 69, no compensatory damages were awarded as a direct result of Monnie's and Mechel's acts regarding the six parcels of property. However, the court did award equitable relief in the form of a constructive trust, ordering Monnie, as constructive trustee, to convey the property back to the corporation.

■ Normally, an award of compensatory damages is a prerequisite to an award of punitive damages. *Hahn v. Ford Motor Company, Inc.* (1982), Ind.App., 434 N.E.2d 943; *Baker v. American States Insurance Company* (1981), Ind.App., 428 N.E.2d 1342, *trans. denied; Large v. Gregory* (1981), Ind.App., 417 N.E.2d 1160; *McCormick Piano and Organ Company, Inc. v. Geiger* (1980), Ind.App., 412 N.E.2d 842; *Newton v. Yates* (1976), 170 Ind.App. 486, 353 N.E.2d 485, *trans. denied.* However, punitive damages are also proper where affirmative relief of an equitable nature has been awarded. *Hedworth v. Chapman* (1963), 135 Ind.App. 129, 192 N.E.2d 649.

■ In *Hedworth* the court affirmed an award of compensatory damages, reformation and punitive damages based on fraud. Monnie distinguishes *Hedworth* stating that no damages were awarded in the

present case. This distinction is not well taken as the *Hedworth* court made it clear in its analysis that it was the equitable remedy of reformation which supported the punitive damage award.

"The weight of authority is that exemplary damages are not generally recoverable in an action for breach of contract. In the case before us we have an action for reformation of a contract wherein the complaint alleges fraud upon the part of the appellant. It is apparent the trial court felt fraud had been established by the evidence when it decreed reformation of the contract and awarded exemplary damages. This case in our opinion is within the rule set out in *Lichter et ux. v. Fulcher et al.* (1939), 125 S.W.2d 501 at page 508, 22 Tenn.App. 670, where the Court of Appeals of Tennessee said:

'Where the case is tried before the Chancellor it is obvious that it is peculiarly within the discretion of the Chancellor as to how much, if any, punitive damages should be allowed. It is a matter of discretion which will not be interfered with by this court. We know of no fixed rule which could guide this or any other court in fixing the amount of exemplary damages to be awarded. And we know of no reason why we should substitute our judgment for the judgment of the Chancellor in this respect.'"

*Hedworth* at 133–34, 192 N.E.2d at 651. Other jurisdictions have held that equitable relief can support a punitive damage award. *Starkovich v. Noye* (1974), 111 Ariz. 347, 529 P.2d 698; *Charles v. Epperson & Co.* (1965), 258 Iowa 409, 137 N.W.2d 605; *I.H.P. Corp. v. 210 Central Park South Corp.* (1962), 16 App.Div.2d 461, 228 N.Y.S.2d 883, *aff'd* (1963) 12 N.Y.2d 329, 239 N.Y.S.2d 547, 189 N.E.2d 812; *Kneeland v. Bruce* (1960), 47 Tenn.App. 136, 336 S.W.2d 319; *National Bank of Commerce v. May* (1979), Tex.Ct.Civ.App., 583 S.W.2d 685. In the present case, the corporation

---

**8.** Mechel does not argue that the punitive damage award against him was not supported by sufficient evidence.

established it suffered an actual loss since property purchased and maintained with corporate assets was improperly titled in Monnie's name. To clear up this irregularity, the corporation had to either file suit for damages or request the court to order the property be conveyed to the corporation. This choice of remedy should not be determinative of whether punitive damages are proper. *Haskins v. Shelden* (1976), Alaska, 558 P.2d 487; *Kennedy v. Thomsen* (1982), Ia.App., 320 N.W.2d 657. Monnie's wrongful actions caused a loss to the corporation which was equitably remedied by ordering Monnie to convey the property, held in his name, to the corporation.

■ The situation is much different with regard to Mechel. Finding 69 contains the requisite elements of fraud and malice for an award of punitive damages against Mechel for his actions regarding the six parcels claimed by Monnie. However, there was no judgment of compensatory damages against Mechel for this conduct. Furthermore, unlike Monnie, no equitable relief was awarded against Mechel as a result of his aiding and abetting Monnie's acts. Therefore, finding 69 does not provide a basis for an award of punitive damages since no affirmative relief was ordered in connection with Mechel's acts.

■ The appellee-corporation argues that Mechel was ordered to pay the corporation the value of his home on Kessler Boulevard and this award supported punitive damages. We disagree. Finding 70 provides the basis for the trial court's judgment against Mechel for the value of his residence. However, neither it nor any other finding reveals that his conduct, which resulted in this judgment, rose to a level which would justify punitive damages. Because special findings were entered, we may not affirm the trial court on any ground. Rather, we must determine whether the specific findings are adequate to support the trial court's decision. *Orkin Exterminating Co., Inc. v. Walters* (1984), Ind.App., 466 N.E.2d 55. In the present case, although finding 69 characterizes Mechel's conduct as worthy of punitive dam-

ages, no compensatory or equitable relief was awarded against him for this conduct. While finding 70 supports an award for compensatory damages for the value of his home, nothing in the findings reveal his conduct, which precipitated the award against him, was serious enough to justify an award of punitive damages. Therefore, the assessment of punitive damages against Mechel is not supported by the special findings and we must reverse it.

*Issue Seven*

■ Monnie and Mechel next challenge the award of attorney fees against them. The court ordered them to reimburse the corporation $343,437.50 for attorney fees. The corporation in turn was ordered to pay the same amount to the attorneys who prosecuted the action. In Indiana, one who prosecutes a derivative action should be reimbursed by the corporation for attorney fees. *Neese v. Richer* (1981), Ind.App., 428 N.E.2d 36. However, we find no basis in the law for the judgment against Mechel and Monnie for attorney fees.

■ Indiana follows the American Rule which prohibits an award of attorney fees against a losing party. *Trotcky v. VanSickle* (1949), 227 Ind. 441, 85 N.E.2d 638. Absent a statute or rule to the contrary each party must pay his own attorney fees. *Id.* Indiana recognizes three exceptions to the American Rule; namely, the obdurate behavior, common fund, and private attorney general situations. These exceptions were explained in *St. Joseph College v. Morrison, Inc.* (1973), 158 Ind.App. 272, 302 N.E.2d 865, *trans. denied*, as follows:

"1) The 'obdurate behaviour' situation. Here the courts use their equitable powers to impose costs on defendants who behaved in bad faith.

2) The 'common fund' situation. Here the courts use their equitable powers to insure that the beneficiaries of litigation are the ones who share the expense. This is a defensive use of the equitable power of the courts to prevent the unjust enrichment of 'free riders'.

3) The 'private attorney general' situation. Here the courts use their power offensively when necessary and appropriate to insure the effectuation of a strong Congressional policy. [Citations omitted.]"

*Id.* at 279–80, 302 N.E.2d at 870 *quoting La Raza Unida v. Volpe* (N.D.Cal.1972) 57 F.R.D. 94. Of these three exceptions, only the obdurate behavior exception could conceivably apply and due to a recent supreme court decision we hold an award of attorney fees against Mechel and Monnie cannot be sustained on the basis that they engaged in obdurate behavior.

■ The obdurate behavior exception is designed to reimburse a prevailing party who has been dragged into baseless litigation. *Cox v. Ubik* (1981), Ind.App., 424 N.E.2d 127. In *Kikkert v. Krumm* (1985), Ind., 474 N.E.2d 503, our supreme court said this exception provides a remedy for defendants who are dragged into baseless litigation. Moreover, the type of behavior which may be characterized as obdurate is a party's failure to dismiss the suit once its baseless nature is discovered. *Id.* The corporation argues that Monnie's and Mechel's refusal to convey property back to the corporation was obdurate behavior. However, under the *Kikkert* analysis, the corporation cannot recover fees because it essentially prosecuted the action. Furthermore, the behavior complained of occurred before the suit was instituted and was not obdurate behavior but merely conduct which formed the basis of the law suit. *Id.* The attorney fee award is, therefore, reversed.

■ The appellants also challenge the award of $7,814.75 in costs against them. The present action was a derivative suit to impose a constructive trust and, therefore, equitable in nature. The allowance of costs in an equitable action, absent a statute or rule, is within the discretion of the trial court. *Atwood v. Prairie Village, Inc.* (1980), Ind.App., 401 N.E.2d 97; *In re Northern Indiana Oil Co.* (7th Cir.1951)

192 F.2d 139. Although, we concluded the appellant's behavior was not obdurate, we believe their respective breaches of fiduciary duty and unfounded claims which forced this suit formed a sufficient basis for an award of costs against them. *Cf. Cox*, 424 N.E.2d at 131 (Garrard, J., dissenting). We conclude the trial judge did not abuse his equitable discretion in assessing costs against Mechel and Monnie.

■ Monnie next takes issue with the propriety of the judgment in favor of the law firm who prosecuted the derivative claim. He correctly points out that a judgment may not be rendered for or against a non-party. *Indiana Department of State Revenue v. Indiana Gamma Gamma of Alpha Tau Omega, Inc.* (1979), 181 Ind. App. 664, 394 N.E.2d 187, *trans. denied.* The law in Indiana specifically regarding a court's authority to award a judgment in favor of non-party attorneys is inconsistent. In *Princeton Coal and Mining Co. v. Gilchrist* (1912), 51 Ind.App. 216, 224, 99 N.E. 426, 429, an action by a minority shareholder to force the majority to reimburse the corporation, the court of appeals stated: "in an action where an allowance may properly be made to the complainant on account of attorney fees, the same may be made directly to the attorneys." In contrast, our supreme court held, in a divorce action, that a judgment for attorney fees directed to the firm itself was void since it was not a party.[9] *Doench v. Doench* (1938), 214 Ind. 559, 16 N.E.2d 877.

■ However, even if *Doench* applies, Monnie and Mechel's contention that the award to the attorneys is void must fail. The judgment reads as follows:

"IT IS ORDERED, ADJUDGED AND DECREED by the Court as follows:

. . . . .

2. Counsel for plaintiff Mitchell Hurst Pinkus Jacobs & Dick and Jones & Loveall recover a judgment against Dotlich Bros. Corp. in the amount of $343,-

9. Indiana Code section 31-1-11.5-16 (1984 Supp.) expressly authorizes the trial court to

enter a judgment for fees directly in favor of the attorneys.

437.50 for reasonable attorneys' fees in the prosecution of this action."

Record at 97–98. This portion of the judgment does not order Monnie and Mechel to pay anything to the law firm. Rather, it is the corporation who is liable. The only party with standing to challenge the validity of this judgment is the corporation. "No party can take advantage of an error committed by a court except the one against whom it was committed." *Johnson, Adm. v. Johnson* (1901), 156 Ind. 592, 60 N.E. 451. A party can argue rulings against himself but not rulings against others. *In re Gilbert* (1924), 195 Ind. 278, 144 N.E. 551. In the present case, the award of attorney fees to the law firm was adverse to the corporation. Monnie's and Mechel's attempt to raise the issue concerning an irregularity in a judgment against the corporation does not present a reviewable question for our consideration. *City of Beech Grove v. Schmith* (1975), 164 Ind. App. 536, 329 N.E.2d 605; *see also Key Hotel Corp. v. Crowe Chizek & Co.* (1977), 172 Ind.App. 15, 359 N.E.2d 262; *Burns Construction, Inc. v. Valley Concrete* (1975), 163 Ind.App. 154, 322 N.E.2d 404.

*Issue Eight*

In 1957 three lots on Kessler Boulevard were acquired for the purpose of building homes for Mechel, Merko, and Sam. Six years later all three brothers had homes built on the property. The evidence showed the lots were acquired and homes built with partnership and later corporate funds. The corporation's tax returns showed the homes were corporate assets. The pertinent findings of fact and conclusions of law are as follows:

"70. Three lots on Kessler Boulevard in Indianapolis, Indiana were acquired and houses built thereon, the same having been acquired and built with partnership and Corporate resources. The addresses, the brother in whose name the property was put and its value in 1978 are as follows:

| Address | | |
| --- | --- | --- |
| 3460 North Kessler Boulevard—Sam | $125,000 |
| 3550 North Kessler Boulevard—Merko | $ 75,000 |
| 3560 North Kessler Boulevard—Mike | $125,000 |

The claims and defenses presented by the Complaint, and the answers of the defendants are amended to conform to the evidence submitted which supports the foregoing.

. . . .

8. The corporation should have judgment against:

Merko Dotlich in the sum of $75,000 representing the value of 3550 North Kessler Boulevard, Indianapolis, Indiana

Sam Dotlich in the sum of $125,000 representing the value of 3460 North Kessler Boulevard, Indianapolis, Indiana.

Mechel Dotlich in the sum of $125,000 representing the value of 3560 North Kessler Boulevard, Indianapolis, Indiana."

Record at 1102.

■ Mechel challenges the trial court's authority to make these findings. He contends the court erred by entering judgment on the issue of ownership of his house since it was never mentioned in the complaint or the pretrial conference report. However, it appears obvious the trial court determined the issue was tried by implied consent pursuant to Indiana Rules of Procedure, Trial Rule 15(B).

The scope of T.R. 15(B) in effecting an amendment to the pleadings was well defined in our recent decision of *Terre Haute Regional Hospital, Inc. v. El-Issa* (1984), Ind.App., 470 N.E.2d 1371, 1374 (transfer pending).

"The pleadings, contentions of the parties and pretrial orders set out only a preliminary guide to the conduct of trial. Either party may, at any time, demand strict adherence to those issues raised prior to the commencement of trial. If the trial court permits the introduction of an issue not raised prior to trial, an objecting party is entitled to a reasonable continuance in order to prepare to meet the newly raised issue. However, where the trial has ended without objection, the

evidence actually presented controls.... [Citations omitted.]

This broad principle is not without its boundaries however. New issues cannot be interjected under the pretense that the evidence is relevant to an already pleaded issue. A party will not be deemed to have impliedly consented to the trial of an unpleaded issue unless he has been given some notice of the existence of that issue. [Citation omitted.]"

Despite the fact that there was evidence and testimony regarding the ownership and value of the brothers' homes, Mechel contends he had no notice that the issue was being tried. Indeed, he argues the trial court's ruling constituted a taking of property without due process of law.

We believe the ownership of Mechel's home was put in issue by Mechel's co-defendant. The cornerstone of Monnie's defense throughout this litigation is that the funds spent on the six parcels of property were his own. Part of the evidence to rebut the allegations that the funds belonged to the corporation involved showing Mechel, Merko, and Sam had homes built at corporate expense. In his opening argument Monnie's counsel stated:

"Another piece of property that Mr. Mitchell conveniently forgot is the three (3) homes on Kessler Boulevard, that Merko has; Sam has; and Mike has. Who built those? They're claiming that they own them, that they're in their name. Who put the labor—who paid for the labor? Who pays for the maintenance on those homes? Who paid for the utilities up through 1973? Who paid for the taxes?"

Record at 1403. Due to Monnie's position at trial, it was necessary to show what money had been spent by his brothers in an attempt to show equality in distribution of corporate income. At trial, Monnie introduced large photos of all three homes; their exterior and interior. Monnie called a witness who testified regarding the value of each home. Sam testified he deeded his house back to the corporation. Merko testified he believed the houses belonged to the corporation. While all this evidence was revealed concerning the ownership of the brothers' homes, Mechel never objected that it went beyond the issues as framed by the pretrial conference or pleadings. Moreover, this was not a new issue interjected under the pretense that the evidence was relevant to an already pleaded issue. *Elkhart County Farm Bureau Cooperative Association, Inc. v. Hochstetler* (1981), Ind.App., 418 N.E.2d 280, 285. In *Elkhart County* the evidence presented to support the pleaded issue also tended to support a finding of estoppel which was not pleaded. The trial court found in favor of Hochstetler on the theory that Farm Bureau was estopped. On appeal we said that Farm Bureau was not on notice and, therefore, unable to defend against the assertion of the affirmative defense of estoppel. Estoppel constituted a new issue. However, in the present case the main issue involved whether the proper owner of the six properties at issue was Monnie or the corporation. Crucial to Monnie's claim of exclusive ownership was his evidence that the other three brothers *owned* homes purchased with funds from the corporate account. The ownership of the Kessler Boulevard homes was not a new issue. Rather, it was an issue inserted into the litigation by Monnie to support his defense. Mechel clearly had notice that the issue was being litigated, and his failure to object resulted in its being tried by implied consent.

■■■ Finally, Mechel argues alternatively that if his home is in fact corporate property, the trial court erred by ordering him to pay the corporation an amount equal to the home's 1978 value. Rather, he contends his liability should be limited to the actual amount expended by the corporation for purchasing and building his home. However, Mechel cites no authority for this proposition and it is, therefore, waived. *Mooney-Mueller-Ward, Inc. v. Woods* (1978), 175 Ind.App. 302, 371 N.E.2d 400; Indiana Rules of Procedure, Appellate Rule 8.3(A)(7).

We reverse the judgment of $10,000 against Mechel for punitive damages. We also reverse the judgment against both Monnie and Mechel for attorney fees. In all other respects the trial court is affirmed.

NEAL and ROBERTSON, JJ., concur.