Perry Johnson and Ray P. Gardner, Individually and as Representative of a Class, Plaintiffs (Ray P. Gardner, Appellee), v. Central Standard Life Insurance Company, an Illinois Corporation, Illinois Bankers Life Assurance Company, an Illinois Corporation, Alfred MacArthur, et al., Defendants (Reliance Standard Life Insurance Company and Alfred MacArthur, Appellants).

Gen. Nos. 51,857, 52,499. (Consolidated.)

First Judicial District.

September 25, 1968.

Rehearing denied and supplemental opinion January 15, 1969.

Kirkland, Ellis, Hodson, Chaffetz & Masters, and Carl Pomerance, of Chicago (Thomas M. Thomas, John J. Edman, and Owen M. Johnson, Jr., of counsel), for appellants.

George B. Christensen, of Chicago, and Robert J. Clendenin, of Monmouth (Winston, Strawn, Smith & Patterson, of Chicago, of counsel), for appellees.

MR. JUSTICE DAVIS delivered the opinion of the court.

Ray P. Gardner and another brought this suit as a class action on behalf of some 41,000 former shareholders of

Illinois Bankers Life Assurance Company ("Assurance Company"). The plaintiffs sought an accounting for secret profits allegedly obtained by certain of the defendants, who at the time, occupied a fiduciary relation to the plaintiffs as either the dominant stockholders, directors, or attorney for the Assurance Company.

The case was referred to a master who recommended an accounting against the defendants, Central Standard Life Insurance Company ("Central Standard"), and Alfred MacArthur; and that the other individual defendants be dismissed. The circuit court entered a decree in substantial conformity with the master's recommendation.

The defendants, Central Standard and MacArthur, appealed and contend that their actions were taken pursuant to court orders in another proceeding, and that plaintiffs' present action constituted an improper collateral attack against those orders; that the defendants' conduct was not improper and did not constitute a breach of any fiduciary duty owed by reason of MacArthur's positions; and that the plaintiffs' action is barred by reason of estoppel and laches. The plaintiffs filed a cross appeal which asked for reinstatement of the defendant, John B. Gallagher, and asserted that the trial court erred in limiting, somewhat, the relief recommended by the master.

This dispute is an outgrowth of Winger v. Chicago City Bank & Trust Co., reported in 325 Ill App 459, 60 NE2d 560 (1945), and in 394 Ill 94, 67 NE2d 265 (1946), on appeal. Winger arose out of a reinsurance contract entered into in 1929, between the Assurance Company and Illinois Bankers Life Association ("Association"). It was there held that the assets of the Association had been obtained fraudulently by the Assurance Company and, consequently, a constructive trust was declared of the entire capital stock of the Assurance Company for the benefit of those persons who were policyholders of the Association as of November 19, 1929.

In 1946 the case was remanded with directions to the circuit court to carry out the distribution of the Assurance Company stock to those who were the Association policyholders as of the 1929 date. Decrees were entered in 1947 to implement the distribution of the Assurance Company stock. The stock was first converted into 325,-000 shares. Thereafter, 97,500 of these shares were awarded to plaintiffs' attorneys in the Winger case, as fees. This represented 30% of the new stock. The defendant, Vernon Loucks, received the majority of these shares and subsequently, by 1950, acquired 75,500 of them. By the end of 1950—the beginning of the critical time with reference to the case at bar—he had obtained authority to sell, along with his 75,500 shares, the other 22,000 shares which had been awarded as fees, thus controlling the disposition of the total 97,500 shares.

By this time, only 138,500 of the remaining 227,500 shares had been distributed. These had been distributed to some 41,000 shareholders in lots averaging less than 4 shares each. On December 20, 1950, the Assurance Company filed a petition in the court which indicated that some 89,600 shares of the stock ultimately would not be deliverable under the court's previous distribution order because of the impossibility of locating all persons entitled thereto.

The Assurance Company represented that four plans had been suggested to it for the disposition of these 89,600 shares of stock; namely,

1. Reduction of total number of shares by the number of shares incapable of distribution;
2. Distribution of the so-called "undeliverable" shares pro rata either to all stockholders or to those who had received their shares because they or their predecessors in interest had been policyholders of the Association on November 19, 1929;

3. Sale of the shares, with proceeds to be credited to the surplus of the company; and
4. Distribution of the shares to a pension fund to be established for employees of the company.

No order was entered on this petition until June 5, 1951.

In the meantime (December 27, 1950), Loucks entered into two contracts with MacArthur, under the terms of which the 97,500 shares originally awarded as attorneys' fees were sold to MacArthur at a guaranteed price of $15 per share, and a price of $20.50 if, on the final determination in the Winger case, the voting strength of these shares would be maintained at 40 to 42%. The latter price is the one ultimately paid for the stock.

At the time the contract was entered into, MacArthur was the chief executive of Central Life Insurance Company and he and his family owned 75% of this company, which in turn owned 92% of Standard Life Insurance Company. The former reinsured the latter in May of 1951 and the name was changed to Central Standard (the defendant). Its present name is Reliance Standard Life Insurance Company. Without disclosing the transaction to Central Life Insurance Company at the time, MacArthur contracted to buy the stock from Loucks, on its behalf, for approximately two million dollars. MacArthur stated that from the very beginning it was his intention to consolidate the three insurance companies through reinsurance.

At the directors' meeting of Central Life held on March 22, 1951, a special committee was appointed to investigate plans and formulate methods for future expansion. The special committee was composed of MacArthur, John B. Gallagher (one of the defendants), and David Kadyk, a director and attorney for the company. The committee was given a million dollars for this purpose. Gallagher and Kadyk were aware of MacArthur's contract with Loucks. A confidential memo was prepared by Mac-

Arthur, for Gallagher and Kadyk, which recited that the million dollar fund placed at the committee's disposal was to be used for the acquisition of the Assurance Company stock under the contract entered into with Loucks.

Thereafter, on March 27, 1951, at the Assurance Company shareholders' meeting, MacArthur, through the 97,500 shares of stock purchased from Loucks, placed himself, his son-in-law, Loucks, and Gallagher on the six-man board of directors of the Assurance Company. The MacArthur-dominated Board brought about the hiring of the Central Life attorney, Kadyk, in lieu of the present Assurance Company attorneys and this was accomplished a few days later. Kadyk, a director and attorney for Central Life, then also represented the Assurance Company in the Winger case.

At this time, the petition filed in December of 1950, for the disposition of the undeliverable stock, was still pending, and no action had been taken on it. Loucks then advised the court that he had sold his stock to MacArthur; that there were two classes of former policyholders of the Association: those who had received their stock in the Assurance Company, and those who had not because they had not been located; and that special counsel should be appointed to represent each of them as separate classes. The court then appointed special counsel for each of these two classes to represent them on the petition before the court.

Hearings were held on this petition in April and May. MacArthur was present at some of them, and Kadyk represented the Assurance Company. On June 5, 1951, the court entered two decrees which provided that approximately 90,000 unclaimed shares should not, in any manner, be disposed of without compensation; that the shares should be offered to the then existing shareholders on a pro rata basis at a price of $5 per share; that after the initial offering the existing shareholders would be en-

titled to purchase additional shares at the $5 price; that the holders of the 97,500 shares (MacArthur interests) purchase all remaining shares at $5 per share; and that the funds from the purchase of the stock be held by the Assurance Company for the benefit of those whose stock was being sold until March 4, 1953, after which time, the funds remaining would be the property of the Assurance Company.

Prior to the entry of these decrees, Kadyk advised the court that MacArthur would buy all the unpurchased stock if the price for the stock were $5 per share, or under; and the court heard evidence, under which it subsequently made its determination that the stock was worth $5 per share as an income investment.

A notice was sent out to the shareholders shortly thereafter, advising them of their rights to purchase additional stock as provided in the decrees, and fixing July 14, 1951, as the final date for receipt of bids therefor. A brief financial statement of the company, as of December 31, 1950, accompanied the notice.

One of the participants in the hearings threatened an appeal from the June 5, 1951, decrees, but the board of directors of the Assurance Company, at the suggestion of Attorney Kadyk, offered $20,000 in settlement, and the party in question caused the appeal to be dismissed prior to the July 14, 1951 sale date.

As a result of the decrees, 89,677 shares were offered for sale. The scattered shareholders had a right to subscribe to 55,129 of these on the pro rata basis, but apparently ended up exercising these rights only to the extent of 5,056 shares. The MacArthur interests purchased the remaining 84,621 shares, which gave them a total of 182,121 shares of the total 325,000 shares issued and outstanding.

Shortly thereafter—in August or early September— MacArthur revealed to the Assurance Company president

that Central Standard proposed to reinsure the Assurance Company. An actuary was engaged to value the Assurance Company for the purposes of reinsurance or consolidation. His report indicated that, on the basis of a conservative estimate, the value per share of the Assurance Company stock was $13.23, including the anticipated funds that the company would retain as unclaimed proceeds from the stock sold under the June decrees.

Thereafter, work proceeded on the reinsurance contract. On September 27, 1951—prior to the execution of the contract between the two companies—MacArthur, his son-in-law and Gallagher resigned as directors of the Assurance Company. The resignations were accepted on October 17, 1951. On October 24, 1951, the new board approved the reinsurance contract. The contract stated that all of the assets and obligations of the Assurance Company were assigned to Central Standard, which would pay to the Assurance Company shareholders therefor an initial sum of $5 per share and further payments of $1 per share each year for ten years. The $15 total represented the commuted value of a cash price per share of $13.27. The Assurance Company stockholders approved the contract on November 26, 1951, and the first payments were made on January 18, 1952. From then on, Central Standard had all of the assets and all of the stock of the Assurance Company.

The master found that by the spring of 1951, MacArthur had become the controlling stockholder and a director of the Assurance Company; that thereby he assumed a fiduciary relationship to the other Assurance Company shareholders; and that he breached this relationship. We believe the master was correct in these conclusions.

It is apparent that MacArthur, from the outset—notwithstanding his testimony before the court in the Winger case in the spring of 1951, wherein he stated that he had

no present intention with reference to reinsurance of the Assurance Company—intended to consolidate, through reinsurance, the three insurance companies. Without informing the court or the other shareholders, he "permitted" Kadyk—a director of Central Life (later Central Standard), and a member of its special committee appointed to acquire the Assurance Company—to represent the Assurance Company in the Winger case on the important issue of how approximately 90,000 unclaimed shares of Assurance Company stock were to be disposed of.

MacArthur or attorney Kadyk, procured testimony before the hearings that the value of this stock was in the neighborhood of $5 per share. No mention was made, nor was any attempt made to solicit evidence of the value of this stock in event of reinsurance or consolidation of the insurance companies. It cannot be controverted that the value of the stock in such an event was substantially greater—being in the area of $15 per share. There also can be no question that such an event was imminent.

The notice which was sent to the shareholders advising them of the right to purchase stock at $5 per share under the decrees of the court, offered not one word to enlighten the other shareholders of the impending consolidation or reinsurance developments. True, it fully advised them of their rights under the decrees, but it did not advise them that MacArthur, the controlling stockholder and a director of the Assurance Company, was contemplating reinsuring the company; that in such an event the stock would be worth more than $5 per share; and that MacArthur had agreed to buy all of the unsubscribed stock at the price of $5 per share.

The large number of small stockholders scattered throughout the country, who had no actual contact with the proceedings or knowledge of the internal affairs of the company, in exercising their judgment as to whether

or not to subscribe for this stock at $5 per share, were at a distinct disadvantage in competing with MacArthur. Thus, out of the 89,677 shares offered at $5 per share to the shareholders, the scattered and small shareholders exercised their rights as to only 5,056 shares, although 55,129 such shares were available to them. And, thus, MacArthur was able to acquire 84,621 additional shares.

Later, when the reinsurance agreement was to be carried out by Central Standard by the payment of $15 per share to the Assurance Company shareholders, 182,121 of the total 325,000 shares were in MacArthur's or Central Standard's hands. Also, since all of the assets of the Assurance Company were to become the property of Central Standard under the reinsurance contract, including the amount paid into the fund for these shares which remained unclaimed on March 4, 1953, this sum would become the property of Central Standard. When this sum was ultimately established, it totalled $348,065.

The net result was that Central Standard purchased the 84,621 Assurance Company shares under the June, 1951, decrees at $5 per share, for a total consideration of $421,305, out of which, however, $348,065 was returned to it out of the windfall from the unclaimed shares fund. Thus, the net cost to Central Standard was approximately $73,240 for the 84,621 shares. At the same time, the scattered stockholders had purchased only 5,056 shares and their net cost was a total of $25,280.

■ We need go no further than the decision in Winger v. Chicago Bank & Trust Co., 394 Ill 94, 108, 67 NE2d 265 (1946), for the oft-stated rule that the directors of a corporation stand in a fiduciary relation to the corporation and its stockholders.

In speaking of the duty owed by the directors of a corporation to its stockholders, the court, in Dixmoor Golf Club v. Evans, 325 Ill 612, 156 NE 785 (1927), at pages 615 and 616, stated:

"The law is well settled that a trustee cannot without a breach of the trust deal with its subject matter in such a manner as to make a profit for his own benefit. It requires no very keen moral perception to recognize the obvious justice of this universal rule of law, of justice and of morality. The directors of a corporation are trustees of its business and property for the collective body of stockholders in respect to such business. They are subject to the general rule in regard to trusts and trustees, that they cannot, in their dealings with the business or property of the trust, use their relation to it for their own personal gain. It is their duty to administer the corporate affairs for the common benefit of all the stockholders and exercise their best care, skill and judgment in the management of the corporate business solely in the interest of the corporation. (Farwell v. Pyle-National Electric Headlight Co., 289 Ill 157.) The stockholders are entitled to the utmost fidelity of the directors to the interest of the stockholders. It is a breach of duty for the directors to place themselves in a position where their personal interests would prevent them from acting for the best interests of those they represent. (Gilman, Clinton and Springfield Railroad Co. v. Kelly, 77 Ill 426; Hooker v. Midland Steel Co., 215 id. 444.) A director of a corporation cannot become the purchaser of property of the corporation which it is his duty to sell. (Chicago Hansom Cab Co. v. Yerkes, 141 Ill 320.) He is subject to the ordinary rule that an agent to sell cannot sell to himself, and an agent to buy cannot buy of himself. The interests of buyer and seller are inconsistent, and an agent cannot represent both interests at the same time. While a director is not disqualified from dealing with the corporation and buying its property or selling property

to it, he must act fairly and be free from all fraud or unfair conduct, his transactions will be subjected to the closest scrutiny, and if not conducted with the utmost fairness, to the end that the corporation shall have received full value, they will be set aside."

██ In Winger, the court again pointed out at page 110, the high standards by which a fiduciary must be tested. It stated that generally, in the absence of a fiduciary relationship, fraud must be proved by those asserting it; but a fiduciary dealing with his beneficiaries is tested by a different standard. In such cases, equity raises a presumption against the validity of the transaction and casts upon the fiduciary the burden of proving affirmatively compliance with equitable requisites in order to overcome the presumption. Thus, the fiduciary may not benefit by dealing with the beneficiaries to their disadvantage.

██ An excellent statement of the standards of conduct required of an officer, director or dominant shareholder of a corporation, is found in Pepper v. Litton, 308 US 295 (1939), at page 311:

"He who is in such a fiduciary position cannot serve himself first and his cestuis second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters. He cannot by the use of the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. He cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage and

28

to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandisement, preference, or advantage of the fiduciary to the exclusion or detriment of the cestuis. Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation."

In discussing the doctrine of corporate opportunity and the dangers implicit in permitting a fiduciary to deal in his own behalf with the property of his beneficiaries, we stated in Paulman v. Kritzer, 74 Ill App2d 284, 219 NE2d 541 (1966), (affd 38 Ill2d 101, 230 NE2d 262 (1967)), at page 291:

"This doctrine is but one of the manifestations of the general equitable rule which demands of an officer or director of a corporation the utmost good faith and loyalty in his relations to the principal which he represents, and requires an undivided and unselfish loyalty to the corporate principal without conflict between this duty and the self-interest anticipated of human nature. The rule, described as inveterate and uncompromising in its rigidity, rests upon the broad foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation. Guth v. Loft, Inc., 23 Del Ch 255, 5 A2d 503, 510, 511 (1939) ; Pelcak v. Bartos, 328 Ill App 435, 66 NE2d 465 (1st Dist 1946) ; 3 Fletcher Cyc Corp, Sec 861 (1965 Ed)."

Under the factual background we have cited, it was a breach of his fiduciary duties for MacArthur to fail

to disclose to the shareholders all the pertinent developments throughout the early part of 1951 wherein the stock of the Assurance Company was involved. Northern Trust Co. v. Essaness Theatres Corp., 348 Ill App 134, 141, 108 NE2d 493 (1952); Agatucci v. Corradi, 327 Ill App 153, 157, 158, 63 NE2d 630 (1945); Wood v. MacLean Drug Co., 266 Ill App 5, 13, 15 (1932).

In Speed v. Transamerica Corp., 99 F Supp 808, affd 235 F2d 369, on page 829, the court stated:

> "The duty of disclosure stems from the necessity of preventing a corporate insider from utilizing his position to take unfair advantage of the uninformed minority stockholders. It is an attempt to provide some degree of equalization of bargaining position in order that the minority *may exercise an informed judgment in any such transaction.*" (Emphasis added.)

The virtual certainty of the reinsurance of the Assurance Company by Central Standard, its effect on the valuation of the stock, the promise of MacArthur to buy all unsubscribed stock at a price of $5 per share, and the facts surrounding the fund which ultimately was certain to be unclaimed, are all matters that should have been brought to the attention of the shareholders.

The breach of fiduciary duties is not rectified by the assertion—as made by the defendants—that the sale of the undeliverable stock was made pursuant to court decrees. The plaintiffs do not, and we do not, challenge these orders. The court was there concerned with eliminating the existence of the undeliverable stock. It sought to wind up a matter that had been before the court for many years, and had it known all of the matters we have recited, it might well have made a different determination. The critical point is that the court did not have before it any question of the existence and scope of the

fiduciary duty owed by MacArthur to the other shareholders of the Assurance Company. MacArthur was not even a party to that litigation, and he might well have complied with the orders of that court without breaching any fiduciary duty. The choice was his. He chose not to disclose, and in so doing breached the trust placed in him as a director by the shareholders of Assurance Company.

The Winger case dealt with different parties and a different cause of action. It may not be a basis of estoppel by judgment. Smith v. Bishop, 26 Ill2d 434, 436, 437, 187 NE2d 217 (1963); Chidester v. Cagwin, 76 Ill App2d 477, 484, 485, 222 NE2d 274 (1966). The fiduciary duty owed by MacArthur in the process of making the acquisition of Assurance Company unclaimed or preemptive shares was not litigated in Winger, and the orders there may not be the basis for an estoppel by verdict. Seymour v. Heubaum, 65 Ill App2d 89, 105, 211 NE2d 897 (1965); Chas. Ind Co. v. Cecil B. Wood, Inc., 56 Ill App2d 30, 36, 205 NE2d 786 (1965). The defendants cannot use the orders entered in the Winger case as a shield to protect their acts allegedly done thereunder, when those acts otherwise would constitute a breach of a fiduciary duty.

The defendants also claim that the plaintiffs are estopped because they obtained all the benefits of the orders in the Winger case. They subscribed to the unclaimed stock; voted for the reinsurance agreement; and accepted the benefits accorded them under that agreement for the stock which they held. The plaintiffs do not, however, challenge the orders in Winger, and they do not challenge the reinsurance agreement. There is nothing inconsistent with the present action and the plaintiffs' conduct in asserting their rights under the Winger decrees. What is challenged is: the failure of MacArthur to make a full disclosure to the shareholders so that all could exercise, intelligently, knowingly, and with the

31

greatest possible degree of equality, the rights which they had. A fiduciary may not withhold material matters from a beneficiary and then assert that the latter, who acted without the knowledge of the facts withheld, is estopped by his acts. Freeman Coal Min. Corp. v. Burton, 388 Ill 604, 614, 58 NE 589 (1945); 13 Fletcher Cyc Corp, c 58, § 5864; 18 ILP, Estoppel, § 23.

 The defendants further assert that the plaintiffs are guilty of laches in not filing this suit until 1956. The master found against this contention, and correctly so. Laches is a failure to assert a right over a period of time, which, when taken in conjunction with all of the other circumstances, would result in undue prejudice to the other party. Seymour v. Heubaum, supra, 105, 106. It is a question addressed to the sound discretion of the court and will not be disturbed on appeal unless the determination of the court is so clearly wrong as to constitute an abuse of discretion. Trustees of Schools of Tp. No. 38 v. City of Chicago, 308 Ill App 391, 401, 32 NE2d 180 (1941). We find no inequity in permitting the plaintiffs to proceed with this action and believe the master was correct in finding the plaintiffs not guilty of laches.

The master recommended that the defendants, Central Standard and MacArthur, account to the plaintiffs: (1) for the profits realized on the acquisition of the 82,677 unclaimed shares (apparently 84,621 shares as computed by the defendants), on the "preemptive" offering at $5 per share; (2) for the residue of the proceeds retained after March 4, 1953, in the fund for the purchase of the undeliverable shares; and (3) for the amount retained by Central Standard by reason of the reinsurance agreement providing that it should pay the shareholders of the Assurance Company direct rather than pay the monies to the Assurance Company; and on the investment return on the last two items.

The trial court held with reference to the first item of accounting that Central Standard—under the orders in

the Winger case—had the right to subscribe for approximately 34,550 shares by virtue of its prior holdings of 97,500 shares; and that if the other shareholders had been fully informed and had purchased all of the remaining unclaimed shares, the defendants would still have been entitled to 34,550 shares. The trial court thus limited the accounting to the profits realized on the shares acquired over and above those shares Central Standard could have obtained by virtue of its ownership of 97,500 shares. The plaintiffs complain of this limitation.

We believe that the trial court was correct in this respect. This action is not an attack upon the decrees or orders in the Winger case. The defendants may not be deprived of what they lawfully could have obtained under those orders.

We are sympathetic with the principle asserted in the argument of the plaintiffs: that a fiduciary should not be permitted any profit from a breach of his trust, and that it is important to uphold that policy in order to discourage temptation. The acquisition of the stock attributable to the original 97,500 is not, however, a profit resulting from any breach of trust, and the asserted rule of law is inapplicable.

While the plaintiffs have not attacked the reinsurance contract, as such, we believe the master and trial court were correct in finding that the amendment to the reinsurance contract—whereby Central Standard was to pay the shareholders, rather than the Assurance Company, for the stock—permitted Central Standard to retain substantial sums because of inability to locate certain additional shareholders. This amended plan was subject to the approval of the Assurance Company shareholders. Since Central Standard had acquired complete controlling interest of the Assurance Company stock by this time, such an amendment was assured of passage and Central Standard assured of an additional windfall. The trial

court was correct in holding that an accounting must also be had as to this item.

The plaintiffs complain of the dismissal of the defendant, Gallagher. We think the master and trial court were correct in this regard. The evidence of wrongful action and breach of duty clearly established the case against MacArthur. There was little by way of evidence to indicate that Gallagher was guilty of any actual wrongdoing.

The defendants also appealed from the order of the trial court assessing master's fees and charges against them. Because of our determination herein, it is apparent that this order must also be affirmed.

The decrees and orders of the trial court, assessing fees and charges, and for an accounting are affirmed, and the cause is remanded to the trial court with directions to proceed with the accounting in a manner consistent with the views expressed herein.

Affirmed and remanded with directions.

MORAN, P. J. and SEIDENFELD, J., concur.

MR. JUSTICE DAVIS delivered the supplement to opinion on denial of petition for rehearing.

Upon rehearing, the defendants urge that we overlooked the in rem jurisdiction of the Winger case over the rights of all Assurance Company shareholders in the constructive trust stock and the consequent conclusiveness of its orders in regard to accountability for the purchase of stock under these orders.

Our opinion, and that of the trial court, recognized that the orders in the Winger case could not be collaterally attacked. We concede that the Assurance Company stock owned by MacArthur, as well as that of all other shareholders, was subject to the in rem jurisdiction of the Winger Court orders. The distinction noted in our opinion

was that MacArthur, individually, as opposed to his stock, was not subject to the jurisdiction of the Winger litigation. Likewise, his conduct in a fiduciary capacity was in no way subject to the jurisdiction of that court. It was his conduct in relation to that proceeding, which is challenged in the case at bar as a breach of his fiduciary responsibilities.

The petition suggests that we recognized that MacArthur was a party to that proceeding by stating that he could have complied with the orders of the court in the Winger case without breaching any fiduciary duty. This conclusion is not warranted from the opinion. We clearly state therein that MacArthur, individually, was not a party to the Winger litigation, and we also pointed out that MacArthur as director, officer, and principal stockholder, was, in effect, the Assurance Company at the time it was complying with the Winger orders with reference to the disposition of the stock. While MacArthur denies it, we believe it a justifiable conclusion that, at the time, he was well aware of what subsequently was going to happen in regard to this stock; and that because of the fiduciary duty which he then owed to the other stockholders, he could, and should, have caused the notice to the other shareholders to contain a full disclosure of the transaction. We did not state that he could have complied with the court order in the Winger case "as a party," but rather, that he could have complied thereunder as the individual controlling the Assurance Company.

It is undisputable that he could have carried out the Winger orders in a manner such that no cause of action would arise. However, because of his dominant position and superior knowledge in relation to what was about to transpire, he could not carry out the orders of the court in the Winger case without fully advising the other shareholders of such circumstances.

35

It is in this that he breached his fiduciary duty. It is for these reasons that we are not collaterally attacking the Winger orders, but rather, the manner in which MacArthur used these orders. We recognize that the defendants assert that this is a distinction without a difference, but we regard it as a legally sufficient distinction. Our decision on this point is not an attack on the Winger case final orders, but rather is the determination of a cause of action arising from the defendant's breach of a fiduciary duty in carrying out these orders. It is our conclusion, as stated in the original opinion, that a fiduciary cannot make use of a valid court order in a manner such that he breaches his fiduciary duties to others without becoming accountable for his actions.

The petition for rehearing also asserts that all of the defendants were, in effect, insulated from direct dealing with the other Assurance Company shareholders by virtue of the Winger court orders.

They urge that all of this action was "judicial action." We believe, and our original opinion sets forth that the manner in which the judicial order was carried out was truly a "corporate action" and a corporate determination. There were in fact direct dealings between the fiduciary and the shareholders, resulting from the court orders, but we refuse to accept that the court orders insulated the defendants from the obligations imposed upon them by reason of their fiduciary relationship.

The petition likewise asserts that the court made factual conclusions unsupported by the record. The first such conclusion is that MacArthur did not disclose to the Winger court his intention to consolidate the insurance companies. The pertinent statement in the opinion refers to MacArthur's testimony wherein he testified that he had no present intention with reference to reinsurance of the Assurance Company. He testified that a merger or consolidation of some sort was under consideration, but

indicated in his testimony that nothing was definite in that he had no present intention with reference to reinsurance.

We implied in the opinion that the statement that he had no present intention with regard to reinsurance was not correct. Such was also the conclusion of the master. It is based upon obvious factors: the resultant value of the Assurance Company to him was present only if he had the reinsurance; the speed with which the transaction took place; the acquisition of the stock in the winter; the hearings in the spring; the order as to disposition in the summer; the determination to reinsure later in the summer. Consequently, we believe it to be a fair conclusion that MacArthur had an intention to reinsure throughout this entire period of time, in event he could get a substantial portion of the other Assurance Company stock.

The other factual conclusion under attack is the statement in the opinion that there was a "virtual certainty" of reinsurance in the spring of 1951. While we regard such circumstance as a virtual certainty, the original opinion actually refers to the matters that MacArthur should have disclosed at the time the notice of the court ordered sale was sent out to the other shareholders. This was in June of 1951 and shortly before the fact of reinsurance was made known by MacArthur to the president of the Assurance Company (in August or early September). When we view the entire transaction, it is apparent that MacArthur went into this transaction initially with fairly well-defined intentions and with the idea that through reinsurance this could be a very profitable investment for him. We conclude that the factual conclusions, insofar as they are drawn in the opinion, are supported by the record.

Upon rehearing, it is also contended that we erroneously concluded that the stock of the Assurance Company

would have been worth substantially more than $5 in the event of "any" reinsurance or consolidation of the three insurance companies. The defendants point out that if the reinsurance had gone the other direction, the value of the Assurance Company stock would not have been greater. This may well be so, but the point that is made in the opinion is that the sole testimony produced at the hearing was with reference to the value of the stock being approximately $5 per share. If MacArthur could have this set as the value for the disposition of the stock and obtain substantial holdings at this price, then realistically there could have been but little question of the reinsurance of the Assurance Company by Central Standard, with the resulting increase in value of the Assurance Company stock.

We did not suggest in the opinion, however, as concluded by the petitioners, that the basis for the decision was that this testimony before the Winger court constituted some sort of intrinsic fraud. While we referred to the entire transaction to set the stage for what MacArthur intended and accomplished, we limited the breach of fiduciary duty by MacArthur to events which were subsequent to the Winger court orders—the failure to disclose in the notice and in the subsequent transactions.

The master's finding, the decree of the trial court, and our opinion, outline the extent and manner in which the defendants should account. The petition urges that we detail the manner of the accounting. It is our purpose to leave the details of such accounting to the trial court upon remand.

 Lastly, the petitioners contend that the plaintiff has suffered no wrong. However, it might turn out on the subsequent accounting that this is not true and that he is yet entitled to additional funds. Be that as it may, the suit is brought as a class action on behalf of the shareholders, many of whom did not exercise rights otherwise

available to them, in part, presumably because of their lack of information. Thus, this class of shareholders have suffered a wrong and should have a cause of action. We hold that a fiduciary cannot assert an estoppel against the beneficiaries, whom it misled.

For the foregoing reasons, we adhere to the opinion as originally adopted, and the petition for rehearing is denied.