Irma LOWRY, Individually and as a Shareholder and Director of Lowry Farms, Inc., a Corporation; and the Farmers & Merchants State Bank, as Successor Personal Representative of the Estate of Emmett D. Lowry, Appellants–Defendants,

v.

Michael LOWRY, Linda DeMoss, Timothy Lowry, as Shareholders of Lowry Farms, Inc., a Corporation; and the First National Bank of Monterey, Receiver of Lowry Farms, Inc., Appellees–Plaintiffs.

No. 66A03–9109–CV–279.

Court of Appeals of Indiana, Third District.

April 20, 1992.

Rehearing Denied June 25, 1992.

---

**614**

Frank E. Tolbert, John S. Damm, Miller, Tolbert, Muehlhausen, Muehlhausen & Groff, P.C., Logansport, for appellants-defendants.

Lesley A. Meade, Lafayette, for appellees-plaintiffs.

HOFFMAN, Judge.

Appellants-defendants, Irma Lowry and The Farmers & Merchants State Bank as the successor personal representative of the Estate of Emmett Lowry, appeal an adverse judgment in favor of appellees-plaintiffs, Michael Lowry, Linda DeMoss, and Timothy Lowry. Appellees brought suit individually and derivatively to recover assets of the corporation, Lowry Farms, Inc. In their claim, appellees alleged, *inter alia*, that Emmett and Irma intentionally diverted corporate assets to their personal use, received excessive compensation, wasted corporate assets, and mismanaged the corporation. Appellees also sued to recover consequential damages to the corporation related to the wrongful acts of appellants. At trial, the action pending against the estate of Emmett Lowry was consolidated with the action pending against Irma.

The evidence relevant to the appeal[1] discloses that Lowry Farms, Inc. is a close corporation which, until the time of its incorporation in 1964, was a family-owned farm business operated as a partnership. The corporation owned more than 900 acres of land.

Emmett's father, Merl Lowry, commenced the farming operation in approximately 1942. Merl died in 1967. In 1975, Merl's widow, Hazel Lowry, divided the shares of the corporation among Emmett and Emmett's children: Michael Lowry, Linda DeMoss, and Timothy Lowry, the appellees-plaintiffs herein. Michael, Linda,

1. The statement of facts within the Brief of Appellants contains argument, confusingly relates witnesses' testimony and other matters in the first person, and focuses upon the evidence favorable to the appellants' position in an effort to attack the evidence most favorable to the judgment. The statement of facts does not comply with Ind. Appellate Rule 8.3(A)(5). The statement of facts shall be a concise narrative of the facts supported by references to the record, stated in a light most favorable to the judgment, and shall not be argumentative. *See FMC Corp. v. Brown* (1988), Ind.App., 526 N.E.2d 719, 723–724 n. 1, *adopted in part* 551 N.E.2d 444, 446; *see also Miller v. State* (1983), Ind.App., 449 N.E.2d 1119, 1120. Rather than order rebriefing, the Court will address the merits.

and Timothy each received nine shares. Emmett received the balance of the 114 outstanding shares. Emmett gave 2.5 shares to his wife Irma, stepmother to Michael, Linda, and Timothy.

Michael was an employee of the farm from 1967 through 1975. After Michael became a shareholder in 1975, he continued to work full-time in the farming operation, until his dismissal by Irma in 1990. Timothy worked for the farm until 1980. Linda did not work in the farming operation. However, from the time they became shareholders in 1975, Michael and Linda were also directors of the corporation. Tim served as a director from 1975 until 1980. Emmett was president of the corporation, Michael served as vice president, Irma was elected secretary-treasurer, and Linda was assistant secretary-treasurer. Between 1975 and 1980, annual meetings were held. After 1980, no annual meetings were held.

Commencing in 1979, Michael had assumed the majority of the responsibility for operation of the farm; however, Emmett and Irma continued to control the finances. Until Emmett's death in 1989, Michael had never been allowed access to the corporation checkbook. Because the corporation had been organized as an S corporation, Michael, Linda and Tim were given only individual shareholder information each year for tax purposes. Emmett and Irma did not provide them with any corporate tax information. Further, evidence adduced at trial revealed that Emmett and Irma falsified information included on their personal tax returns, and that some corporate tax information regarding amounts which should have been included as dividends to Emmett and Irma in 1983 were never reflected in tax documents.

In 1981, Emmett and Irma executed a mortgage on the corporation's realty to secure a $75,000.00 promissory note. The proceeds of the loan were used to assist Irma's son in the purchase of a sawmill. Emmett and Irma did not inform Michael, Linda and Tim of the mortgage.

In 1983, Emmett and Irma mortgaged corporate property to secure personal indebtedness. The proceeds of the $126,-000.00 mortgage were used to retire a $104,500.00 debt owed by Emmett's trucking company to Peoples State Bank. The balance of the proceeds were paid to Emmett. Again the mortgage was executed without the knowledge of the other shareholders, Michael, Linda and Tim.

Michael became aware of the 1983 mortgage during the summer of 1986 when a neighbor inquired about an 80–acre tract of farm property for sale. Michael then read in a newspaper that Peoples State Bank was foreclosing on the land. Desiring an explanation of the foreclosure, Michael discussed the matter with Roger Cummings of Peoples State Bank. Michael learned of the 1983 mortgage and that the corporation was somehow involved in a sawmill project. Also in 1986, Michael visited the county courthouse and discovered the 1981 mortgage on the property.

Upon discovery of the mortgages, Michael asked Emmett for information regarding those mortgages. Emmett refused to respond to the inquiries. Michael, Linda and Tim sought legal advice.

In December 1986, Emmett and Irma filed a Voluntary Petition for Bankruptcy on behalf of the corporation. Appellees learned of the filing after it was accomplished. Subsequently, the trustee dismissed the petition. Although they had no knowledge of the details, appellees became aware that the corporation had suffered substantial losses.

After they became aware of the corporation's financial difficulties, appellees began a concerted effort to gain pertinent corporate information. In a 1987 meeting held at the office of counsel for the corporation, appellees' attorney asked for information regarding the proceeds from the loans which resulted in the mortgages. In response to the request, Irma and Emmett left the meeting. By the time of the filing of the original complaint in December 1989, appellees had still not been apprised of the purpose of the loans.

During discovery, appellees learned that in 1982, Emmett and Irma had amended the Articles of Incorporation for Lowry Farms and had filed the amendment with

the Secretary of State. The amendments altered the corporation to a C corporation. The stock was divided into two classes. Appellees' shares became non-voting common stock, and the shares held by Emmett and Irma became voting preferred stock. The Articles of Amendment state that the action was taken July 30, 1982 by unanimous written consent of the directors. Also, the Articles recite that all 114 outstanding shares voted in favor of the amendment. However, appellees were unaware of the amendment. They had not voted their shares and did not give consent to the amendment.

When Emmett died in 1989, Irma gave Michael the corporate checkbook and the corporate minute book. Through the information gathered from those sources, coupled with the information gained through discovery after litigation was filed, appellees assessed the damage to the corporation.

Although the salaries for Emmett and Irma were set as reflected in the corporate minute book, each had received amounts greatly in excess of the set amounts. At the trial held between September 26, 1990 and October 1, 1990, an agricultural and financial manager testified that 10% of the gross income of a farm would be a reasonable management fee. Between 1979 and 1985, Emmett and Irma paid themselves $130,320.00 in excess salaries.

The testimony of a certified public accountant was presented to establish the damage to the corporation. He testified that the $130,320.00, compounded yearly at a conservative interest rate of 10%, represents $277,045.00 which could have been used to reduce the debt of the corporation. Further, the excessive compensation and the conversion of corporate assets to personal use, including the outstanding loan balances, resulted in a loss of $533,753.64.

After appellees filed the present lawsuit and just prior to trial, Irma unilaterally embarked upon a course to further raid corporate assets, to foreclose appellees' participation in the corporation, and to indemnify herself from liability for any of her actions. A special shareholder meeting was held in March 1990 at the offices of Miller, Tolbert, Muehlhausen & Muehlhausen. The minutes of the meeting stated that Irma was the only shareholder present because she held all shares entitled to vote. Irma purported to elect herself sole director, president and secretary of the corporation. Irma called a director's meeting to follow.

Acting upon the authority that she had voted herself, Irma as the sole director of the corporation was the only director present at the director's meeting. The minutes recite that, acting upon advice of counsel and an accountant, the Board resolved that, due to the illiquidity of Emmett's estate and in order to retire debts for taxes and other obligations of the estate, the corporation would adopt a "Plan of Complete Liquidation." Miller, Tolbert, Muehlhausen & Muehlhausen, P.C. would be employed exclusively as corporate counsel. Blue & Company, certified public accountants, an employer of Irma's sister, would be employed exclusively as the accounting firm for the corporation. Further, the minutes state that due to "the problems encountered with Michael D. Lowry, who, as an employee of the corporation, was residing on the premises of the corporation, with respect to his conduct or the lack of knowledge thereof occurring since May 1989, in all matters including the assertion of unauthorized control over the checkbook, the representation of ownership in corporate assets, and it was thought that the employement [sic] of Michael D. Lowry should be terminated instanter and counsel for the corporation was instructed that immediate action should be taken with respect to his tenancy as the farm resident and his assertion of unauthorized control over various assets ..."; therefore, all banking authorities and creditors would be notified that Michael was terminated as an officer, director, and employee of the corporation and that Michael would be served with notice to vacate the premises. Finally, Irma determined that in her capacity as president of the corporation, Irma received a demand upon Irma, in her capacity as executor of Emmett's estate, for payment of a promissory note dated March 3, 1965,

in the amount of $28,937.14, together with $48,204.54 in interest, for a total amount of $77,121.68 due to Emmett's estate from the corporation.

During April 1990, again in the office of corporate counsel, Irma in her capacity as sole director and chairman of the meeting asserted "that the corporation was indebted to the estate in a gross amount in excess of $61,000 and a net amount of approximately $48,000 and that the estate was in need of funds and the corporation was in a position to pay some but not all of this indebtedness." Accordingly, Irma resolved "that the corporation pay $35,000 of its indebtedness to the Estate of Emmett Dean Lowry, *instanter.*" In a July 1990 meeting, Irma resolved to proceed with the liquidation of the farm and its assets.

The minutes of a special meeting of the shareholders held on August 20, 1990, at the office of corporate counsel, reflect that with regard to the present litigation, Irma resolved "that Lowry Farms, Inc., agrees to indemnify and hold harmless Irma Lowry and Emmett D. Lowry as director and officer of the Corporation from all liability and expenses in their official capacity in connection with all claims filed against them in the Pulaski Circuit Court since the Corporation has determined that each individual's conduct was in good faith and that they reasonably believed that the actions taken by them in their official capacity was [sic] in the best interest of the Corporation."

After trial on December 3, 1990, the court entered an order finding in favor of appellees on their claims, removing Irma as an officer and director of the corporation, appointing a trustee to manage the corporation and vote the shares in which Irma inherited a life estate as a result of Emmett's death, ordering repayment of $35,-000.00 collected by the estate from the corporation for the promissory note, and awarding attorney's fees. The court then set the matter for a hearing on damages.

Ultimately on May 29, 1991, the court entered an order ruling on appellants' Motion to Correct Errors and other motions including a Motion for Relief from Judgment. The court granted relief from the judgment to the extent that a portion of the award set at $152,799.00 was reduced by $24,403.00, thereby reducing the total judgment to $509,360.64. Judgment was entered against Irma, individually, and the Estate of Emmett D. Lowry, jointly and severally. Further, the court granted the personal representative of Emmett's estate the authority to appeal the judgment but ordered Irma, individually, to pay one-half of the transcript preparation costs. Also, the court required a bond. This appeal ensued. Additional facts appear below as needed.

As restated, the issues presented for review are:

(1) whether the trial court erred in determining that appellees' claims for damages, for the years 1979 through 1985, were not barred by the statute of limitations;

(2) whether the evidence is sufficient to sustain a finding of "excessive compensation" to Emmett and Irma;

(3) whether the trial court erred by allowing recovery for "economic costs" to the corporation; and

(4) whether the trial court erred by including interest in the award.

First, appellants contend that the trial court improperly determined that the statute of limitations would not bar appellees' claims for the years 1979 through 1985. Appellants base their contention that the claims are barred upon the premise that the claims all sound in negligence requiring any action to commence within two years of the wrongful conduct. Further, appellants argue that notwithstanding appellees' lack of information regarding appellants' actions, the statute of limitations should not be tolled because appellees did not exercise due diligence to discover the wrongful conduct. The evidence belies appellants' contentions.

The complaint and amended complaint sought damages based upon, *inter alia:* negligence, intentional wrongful conduct, fraud, unjust enrichment, oppression by those owing a fiduciary duty, waste and

diversion of corporate assets. Additionally, appellees requested an accounting, a permanent injunction against Irma selling the shares of stock within Emmett's estate, and Irma's removal as an officer and director of the corporation along with any other just relief.

The evidence establishes that appellees actively sought information about the wrongful conduct beginning in 1986 when Michael discovered the 1981 and the 1983 mortgages on corporate property. Prior to Emmett's death, Michael requested information from his father regarding the use of the money obtained through the mortgage of corporate property. Emmett refused to divulge the information. After appellees retained counsel, Emmett and Irma abruptly left a meeting rather than answer questions propounded by appellees' counsel regarding corporate finances. Subsequent to Emmett's death, and significantly after the lawsuit was filed, appellees learned through a statement by Irma and through discovery, that the proceeds of the 1981 and the 1983 mortgages were diverted to personal use by Emmett and Irma. Appellees also learned of the 1982 Articles of Amendment which falsely stated that appellees had unanimously agreed to the change in corporate form which stripped them of their right to vote their shares of the corporation.

In the trial court's December 3, 1990 order,[2] the court found that: "all claims ... were timely filed; that the fraudulent acts ... are within the applicable Statute of Limitations for fraud; [and] that the remaining acts of said defendants in breaching their fiduciary duties are within Indiana Code 34-1-2-3."

The statute of limitations applicable to actions for fraud, IND.CODE § 34-1-2-1 (1988 Ed.), provides that such action must be commenced within six years after the

cause of action has accrued. IND.CODE § 34-1-2-3 (1988 Ed.) states:

"All actions not limited by any other statute shall be brought within ten (10) years unless the cause of that action arose before September 1, 1982, in which case the action must be brought within fifteen (15) years. In special cases, where a different limitation is prescribed by statute, the provisions of this section shall not apply."

Further, IND.CODE § 34-1-2-9 (1988 Ed.) states:

"If any person liable to an action shall conceal the fact from the knowledge of the person entitled thereto, the action may be commenced at any time within the period of limitation after the discovery of the cause of action."

Appellants contend that the only applicable statute is IND.CODE § 34-1-2-2(1) (1988 Ed). That statute provides, in pertinent part:

"The following actions shall be commenced within the periods herein prescribed after the cause of action has accrued, and not afterwards:

(1) For injuries to person or character, for injuries to personal property, and for a forfeiture of penalty given by statute, within two (2) years."

This Court has addressed the statute of limitations question in a shareholder's derivative action in *Dotlich v. Dotlich* (1985), Ind.App., 475 N.E.2d 331, 340-342. Due to its peculiar applicability to the issues at hand, a review of the *Dotlich* case with a recitation of its factual background is appropriate. In *Dotlich*, four brothers formed a heavy equipment rental business in partnership form in 1948. As the partnership grew and the partners desired to expand the business to include the acquisi-

---

**2.** The trial court's judgment dated January 17, 1991 appears within the Appendix to Appellants' Brief but is not included within the record. Except for the name of the trustee appointed and the amount of damages awarded, which was modified by the May 29, 1991 order contained within the record, the court's final judgment is based upon the findings within the December 3, 1990 prejudgment order which ap-

pears within the record. Pursuant to Ind. Appellate Rule 7.2(B), portions of the record not transmitted are nevertheless part of the record on appeal. However, because the orders from December 3, 1990 and May 29, 1991 contain the matters most pertinent to review, a writ of certiorari to the trial court clerk for transmittal of the January 17, 1991 order is not required.

tion and rental of real estate, the business adopted corporate status. Two corporations were formed, one in 1960 and one in 1962. The corporate finances were entirely controlled by one brother, Monnie. The brothers made no distinction between personal and business income and expenses. All income, including Sam's disability check, and all expenses, were funneled through a single checking account controlled by Monnie. Lots were purchased and homes were built for three of the brothers, Sam, Merko, and Mechel. Sam and Merko believed that ownership of the properties and homes remained with the corporation. Between 1964 and 1975, a farm, lake property and three rental properties were purchased by the corporation. Sam, who ultimately brought the derivative suit, was unaware that Monnie titled the properties in his name alone. Between 1976 and 1978, Sam learned of Monnie's actions. Sam retained counsel and attempted to withdraw from the corporation. Sam presented a plan developed by his own accountant and the accountant for the corporation. The other brothers rejected the plan. Monnie stated that he would take all of the money to prevent Sam's withdrawal. Sam then made other attempts to resolve the controversy, which were rejected by Monnie and Mechel thereby deadlocking the directors. Sam determined that further negotiations would be pointless.

In 1979, Sam filed a shareholder's derivative suit alleging that "Monnie and Mechel had breached their fiduciary duties to the corporation by converting corporate opportunity to their own benefit." *Id.* at 337. It was alleged that Monnie mismanaged corporate finances and improperly held valuable corporate property in his own name. Mechel was accused of aiding and abetting Monnie's acts. The corporation asked that the property be conveyed to the rightful owner and punitive damages be assessed against Monnie and Mechel. Further the complaint sought a court-appointed receiv-

er to manage the corporation. Along with other relief granted, the court required Monnie to transfer the property he claimed as his own to the corporation.

On appeal, Monnie claimed that the statute of limitations barred litigation of the ownership of at least two of the properties. In *Dotlich,* this Court utilized the same statutes of limitations employed by the court in the present case: the six-year statute of limitations for fraud, IND.CODE § 34–1–2–1; and the 10–year or 15–year statute of limitations employed for actions which are not governed by another statute, IND.CODE § 34–1–2–3. *Id.* at 340. Also, as in the present case,[3] Monnie argued that because he had not actively concealed information by "trick" or "contrivance," the statutes of limitations should not be tolled based upon Sam's lack of knowledge. *Id.* at 341.

In finding that the statutes were tolled based upon concealment, this Court stated:

"Under most circumstances the concealment statute [IND.CODE § 34–1–2–9 (1982)] will extend a party's time to file a suit only when the opposing party actively and intentionally conceals the cause of action. *Forth v. Forth* (1980), Ind.App., 409 N.E.2d 641. In *Forth* the court characterized concealment as some 'trick' or 'contrivance' on the part of the defrauder. However, where the defrauder has a duty to disclose material information to individuals with whom he has a fiduciary or confidential relationship the requirements of active and intentional conduct do not apply.... Clearly, Monnie had a fiduciary duty to both the corporation and the other shareholder-directors.... Monnie had a duty to act fairly, honestly, and openly with his brothers and the corporation.... Indeed, because of Monnie's total control over the corporation's funds and the absolute trust and faith bestowed on him

---

**3.** Appellants rely upon *Fairrow v. Fairrow* (1989), Ind.App., 543 N.E.2d 649, for this proposition within their Brief of Appellants. *Fairrow* was vacated by the Indiana Supreme Court. *Fairrow v. Fairrow* (1990), Ind., 559 N.E.2d 597. Inadvertent or mistaken use of authority which

has been vacated is not looked upon favorably. However, citation to such authority in the present action is more puzzling where review of the record reveals that the status of the case was disclosed to counsel during the proceedings below.

by his brother, Monnie may have been bound by an even higher standard of duty.... Monnie's fiduciary responsibility required him to disclose to the other directors that he intended to keep the Speedway property. [Citations omitted.]"

*Id.* at 341. In determining that the statute of limitations was tolled, the Court went on to state, " 'The duty to disclose stems from the necessity of preventing a corporate insider from utilizing his position to take unfair advantage of the uninformed minority stockholders.' " *Id.* at 342, *quoting Johnson v. Central Standard Life Insurance Co.* (1968), 102 Ill.App.2d 15, 243 N.E.2d 376, 384. Also, the Court noted that Sam was justified in trusting Monnie because of the fiduciary relationship; thus, Sam would not be charged with a duty to exercise diligence to guard against misappropriation of assets by his brother. *Id.* at 342, n. 6.

The reasoning in *Dotlich* applies with equal force in the present case. In fact, some circumstances in the present action are more egregious than those which existed in *Dotlich.* Here, at some point Irma and Emmett, who controlled the corporation's finances, began to regard the corporation assets entirely as their own. They paid themselves large salaries which were not approved by the directors and which the corporation could not sustain considering its debt load. Although Michael had assumed the majority of the responsibility for the farming operation and earned between $8,000.00 and $10,000.00, Emmett and Irma paid themselves approximately $36,000.00 in 1981, $50,000.00 in 1982, $72,000.00 in 1983, $48,000.00 in 1984, and $37,000.00 in 1985. Except for their control of the corporate finances, Emmett and Irma provided few services to the corporation. Emmett's failing health foreclosed his participation in much physical work and Irma admitted that she devoted about 520 hours per year toward corporate business.

Additionally, discovery of the full extent of the fraud was thwarted insofar as Irma also admitted some information she and Emmett provided regarding their personal income taxes was false. Emmett and Irma mortgaged corporate property for their personal benefit and for the benefit of Irma's son, a non-shareholder, without the knowledge of the other shareholders. They drained the corporation's assets without regard to corporate liabilities thereby allowing the corporation to default on corporate obligations. They altered the corporate form and the status of the shares owned by appellees without the knowledge or consent of appellees, although the Articles of Amendment falsely recite that all shares voted in favor of the amendment. Additionally, once appellees became aware of the faltering financial condition of the corporation, Emmett and Irma refused to divulge information which, for the most part, was obtained after the lawsuit was filed.

Because Emmett and Irma violated the fiduciary duty of directors and shareholders within a close corporation to operate fairly, honestly and openly, *see Dotlich, supra,* the statutes of limitations applicable to the present case were tolled until disclosure or discovery of the wrongful conduct. Emmett and Irma utilized their positions as directors and shareholders as well as their control over the corporate finances in derogation of their fiduciary duties. The evidence demonstrates, subsequent to Emmett's death and the filing of the lawsuit, Irma continued on a course of self-dealing and wrongful conduct regarding the other shareholders by purporting to elect herself sole director, transfer the remaining assets of the corporation to Emmett's estate, and indemnify herself against liability. Therefore, appellants' contention that a two-year statute of limitations is applicable and would foreclose appellees' claims is unavailing.

Even if the two-year statute should be applied to a portion of the claims, the statute did not begin to run until disclosure. *See Dotlich, supra.* Prior to the lawsuit, appellees discovered only that corporate property had been encumbered by two mortgages, and that corporate property was being foreclosed upon. Appellees could only surmise from the state of the corporation's financial affairs the extent of

the damage wrought by Emmett and Irma, and that the loans were not used for the benefit of the corporation.

■ Additionally, appellants urge that the doctrine of laches should bar appellees' claims. Laches is an equitable doctrine which may not be applied arbitrarily or in the absence of conformity with general principles of equity. *LaPorte Prod. Credit Ass'n v. Kalwitz* (1991), Ind.App., 567 N.E.2d 1202, 1204. Laches is comprised of three elements: inexcusable delay in asserting a right; an implied waiver arising from knowing acquiescence in existing conditions; and, a change in circumstances causing prejudice to the adverse party. *Id.* "A mere lapse of time is insufficient; unreasonable delay which causes prejudice or injury is necessary. [Citation omitted.]" *Id.* The evidence does not support a finding of laches. Despite efforts by appellees to gain information regarding the mortgages, appellants' refused to divulge information even during meetings with appellees' counsel. Appellants continued their course of deceitful conduct after the lawsuit was filed. Appellants are not in a position to assert an equitable defense of laches.

Accordingly, the trial court did not err in determining that the claims were timely.

■ Next, appellants claim the evidence is not sufficient to sustain a finding in favor of appellees regarding their claim that Emmett and Irma received "excessive compensation." Initially, it should be noted that a court on appeal neither reweighs the evidence nor judges the credibility of witnesses and will not reverse the trial court's determination on the evidence unless there is a total lack of supporting evidence or the evidence is undisputed and leads solely to a contrary conclusion. *See Brancheau v. Weddle* (1990), Ind.App., 555 N.E.2d 1315, 1317. On review, this Court may consider only the evidence within the record which supports the judgment along with the reasonable inferences to be drawn therefrom. *Moody v. Moody* (1991), Ind. App., 565 N.E.2d 388, 390.

■ A court of equity will provide a minority shareholder with a remedy when a majority shareholder of a close corporation, in violation of a fiduciary obligation, appropriates the profits of the corporation for salaries. *Cole Real Estate Corp. v. Peoples Bk. & Tr. Co.* (1974), 160 Ind.App. 88, 310 N.E.2d 275, 279. However, a court may not substitute its judgment for that of the board of directors in determining what is a fair and reasonable compensation for corporate officers. *Id.* 310 N.E.2d at 279–80. "Once a corporate officer's compensation is challenged, the burden of establishing unreasonable compensation lies with the minority shareholder instituting the action." *Id.* at 280; *see also Krukemeier v. Krukemeier Mach. & Tool* (1990), Ind. App., 551 N.E.2d 885, 887.

■ Appellants contend that evidence presented by appellees that 10% of gross profits represents a reasonable management fee conflicts with their evidence. Appellants contend that evidence within the record supports a finding that Emmett or any corporate officer who performed substantial management duties could negotiate for a salary greater than 10% of gross profits. Also, appellants complain that their expert testified that neither he nor his partner knew of the 10% figure used to assess reasonable compensation. Appellants request that the evidence be reweighed and that the witnesses' credibility be rejudged. Based upon the standard of review, this Court must decline the request.

Moreover, the evidence demonstrates that Emmett and Irma did not negotiate for the salaries they received. Their salaries were set by the Board of Directors in an amount substantially less than the 10% which appellees agreed would be reasonable. In 1976, Emmett's salary was set at $15,300.00 per year. No salary was ever approved for Irma. Yet in 1983, Emmett received over $29,000.00, and Irma received more than $42,000.00 in compensation. The Board never authorized Emmett and Irma to pay themselves essentially all profits realized by the corporation. Further, the evidence supports a finding that Emmett and Irma did not perform the substantial management duties for which a 10%

fee is reasonable. Michael who was performing the duties necessary to operate the farm was paid approximately seven times less than Emmett and Irma in some years.

In *Cole,* the majority shareholder who treated all profits as her own, did not hold annual shareholders meetings, and whose salary was not approved by the directors was held to have breached a fiduciary duty to the minority shareholders by receiving unreasonable compensation. *Cole, supra,* 310 N.E.2d at 279–280. As in the present case, the evidence in *Cole* demonstrated that 10% of gross profits would represent a reasonable compensation to the manager of real estate holdings. *Id.* at 279.

Appellants rely heavily upon the *Krukemeier* decision which upheld a finding that a minority shareholder failed to demonstrate that excessive compensation was paid to the other shareholders. *See Krukemeier, supra,* 551 N.E.2d at 888–889. In *Krukemeier,* the salaries were set by the directors and evidence disclosed that the salaries were reasonable. *Id.* Contrary to the present case, the minority shareholder was appealing from a negative judgment. While the legal analysis in *Krukemeier* is fully applicable to the instant matter, the evidence is much different and does not dictate a finding for appellants.

The evidence supports the trial court's decision that Emmett and Irma were unreasonably compensated in all amounts above 10% of the gross profits of the corporation.

■ Next, appellants contend that the trial court erred in allowing recovery for "economic costs" to the corporation. Appellants do not clearly controvert the amount of damage awarded. Instead as distilled, appellants argue that no damages should be allowed because their actions with regard to their personal finances and other business ventures rendered inevitable the financial devastation of the corporation. Appellants insist that mortgaging corporate property to pay debts owed by Emmett's trucking business did not result in damage to appellees. Appellants argue that after Irma's life estate in Emmett's shares of the corporation, appellees will inherit all interest in the corporation.

Thus, appellants urge, because Emmett's estate was ultimately responsible for the debts of Emmett's failed trucking business, the result would have been the same to appellees: reduced value of Emmett's assets in the estate which are the shares of the corporation.

Appellants' arguments ignore legal and economic reality, as well as the evidence. Michael, Linda and Tim brought the action on their behalf and derivatively on behalf of the corporation. The corporation was unable to carry its debt load after Emmett and Irma embarked upon a course of siphoning assets and profits from the corporation for their personal use. Their misappropriation of the corporation's assets resulted in an impact greater than the actual money taken. The corporation was denied the opportunity to use the money for investments, improvements, and to reduce its own existing indebtedness together with the interest which was accruing. Also, the mortgages upon corporate property increased the corporation's indebtedness in the amount of the principal loan and the interest thereon. Emmett and Irma breached their fiduciary duty to deal openly, honestly, and fairly with the minority shareholders. *See Dotlich, supra,* 475 N.E.2d at 341. Their wrongful conduct culminated in the financial ruin of the previously viable corporation. Thus, an argument that ultimately appellees did not sustain damage is without merit.

■ Appellants also contend that Emmett and Irma used good business judgment, acted upon advice of counsel, and acted in good faith in making their decision to mortgage corporate property to pay the trucking company debts. Appellants rely upon IND.CODE § 23–1–35–1 (1988 Ed.) which allows directors to avert personal liability if they act in good faith, "with the care an ordinarily prudent person in a like position would exercise under similar circumstances," and in a manner reasonably believed to be in the best interests of the corporation.

The record belies an assertion that Emmett and Irma acted in good faith and used good business judgment as to any of the

claims made by appellees. Appellants direct the court to Irma's testimony with regard to the best interests of the corporation and whether it was based upon advice of counsel, when she and Emmett made the decision to mortgage corporate property to retire the debt owed by Emmett's trucking business. It should be noted, the trial court sustained appellees' objection to a portion of the testimony quoted in the Brief of Appellants. Considering the evidence in total, Emmett and Irma acted without regard to the best interests of the corporation and the minority shareholders. They mortgaged corporate property for their personal benefit and the benefit of Irma's son, without the knowledge or consent of the other directors or shareholders. *See Griffin v. Carmel Bank & Trust Co.* (1987), Ind.App., 510 N.E.2d 178, 182–182 (court reversed award of summary judgment in favor of corporate officers and directors who approved loans to themselves in violation of fiduciary duty; court found that corporate director or officer is liable for loss of corporate assets due to his negligence, fraud, or abuse of trust).

In *Dotlich, supra,* this Court noted:

"Once it is established that one with a fiduciary duty has attempted to benefit from a questioned transaction, the law presumes fraud. At this point, the burden of proof shifts to the party with the fiduciary duty to overcome the presumption by showing his actions were honest and in good faith. [Citations omitted.]"

*Dotlich, supra,* 475 N.E.2d at 342. Here, appellants failed to carry their burden. No ground for error is presented.

■ Finally, appellants complain that the trial court erred in calculating interest at 10% per annum. As above, appellants mischaracterize all of appellees' claims as ones based upon negligence. As noted above, the evidence proves otherwise. Appellants then mischaracterize the award as one which includes prejudgment interest. Appellants urge that the amount of the award was not readily ascertainable and, thus, not subject to prejudgment interest. *See Gravis v. Graves* (1991), Ind.App., 574 N.E.2d 952.

The evidence at trial demonstrated that a portion of the "economic costs" to the corporation as a result of appellants' conversion of assets was the lost economic opportunity and the corporation's inability to meet its obligations which were accruing interest. Appellees' expert witness conservatively estimated the loss at an additional 10% compounded annually. In reality some of the corporate loans carried a higher interest rate, and the interest on some obligations was compounded monthly or daily.

■ In a derivative action setting, the interest attributable to loss of profits and earning potential, coupled with an inability to meet obligations due to the wrongful conduct of the directors, is a portion of compensatory damages. *Cf. Dotlich, supra,* 475 N.E.2d at 338, 348–350 (derivative action is equitable in nature, judgment requiring appellees and appellant to reimburse the corporation for homes and lots purchased by corporation at appreciated value was sustained). *Cf. also Griffin, supra.* The court did not set a damage figure and calculate 10% interest to arrive at an award. Instead each facet of the award, "excessive compensation" and "economic costs," was treated separately. Appellants failed to demonstrate error.

There being no finding of reversible error, the trial court's judgment is affirmed.

Affirmed.

GARRARD and CHEZEM, JJ., concur.